**ORRISON et al. v. C. HOFFBERGER CO.**

Civ. No. 4637.

United States District Court
D. Maryland.

April 19, 1951.

Judgment Affirmed July 26, 1951.

Barton, Wilmer, Bramble, Addison & Semans, Richard S. Wright, Baltimore, Md., and Moore & Hall, Washington, D. C., for plaintiffs.

Morton J. Hollander, Baltimore, Md., and Charles M. Thomas, Washington, D. C., for defendant.

WILLIAM C. COLEMAN, Chief Judge.

This is a patent suit involving alleged infringement of patent No. 2118796 issued May 24, 1948, to Kelvin T. Orrison, on application filed April 14, 1938, but continuation in part of application filed January 31, 1938, for ice used in beverages, and also for the process of producing the ice.

The defendant, a Maryland corporation, is an ice producer. There are the usual defenses of non-infringement and invalidity of the patent through anticipation by prior art patents and prior use or publication, and also the defense of fraudulent conduct by plaintiffs in prosecuting the patent in the Patent Office and laches, i. e., their delay in bringing the present suit.

The patent embraces nine claims but only the first seven claims are in suit. Of these, the first five are product claims and claims 6 and 7 are process claims. As stated in the patent, one of the objects of the invention "is to provide a commercially feasible supply of crushed, graded ice in a readily available package form for dispensing by drug stores, ice cream parlors, hotels, restaurants and the like". It is also stated that another object "is to produce as a new product, clean, discrete [non-adherent] free-flowing sparkling crystal clear lumps of ice free from snow and preferably of

predetermined graded sizes." As respects the process of the patent for making this ice product, it is claimed that it will produce it "in a cheap and practical manner." The patentee claims that both his product and process are new in that prior to his invention ice was added to beverages either in the form of ice cubes or crushed ice, the latter being produced by crushing a block of ice with a resultant mixture of pieces of ice of various sizes including what is known in the trade as "snow", consisting of the finest particles of ice formed by the shavings from the crushing operation and also from the crushing of the cloudy part of the block of ice; and that this snow is objectionable for use with beverages because it melts too fast and packs together readily. Orrison claims that his product is entirely free of snow so that the lumps of ice which he produces are clean, free-flowing, i. e., do not stick together, and are sparkling and crystal clear. He states the result is that when the ice is to be sold to hotels, restaurants, drugs stores, etc., it can be packed and delivered in large canvas bags or other containers similar to those generally used for packing and delivering commonly known ungraded crushed ice, but that unlike the latter, the graded pieces of ice produced pursuant to the patent will not stick together but will be free-flowing, non-adherent lumps like hard coal of similar grades, thus insuring slower melting and slower deterioration of the ice.

Of the five product claims, No. 1 is typical of the broader, and No. 5 of the narrower of these claims. No. 1 reads as follows: "As an article of manufacture, a free-flowing mass of ice in bulk form produced by crushing ice into lumps and then screening to produce discrete pieces free from snow, the sharp edges of the pieces produced by crushing being rounded by abrasion from the screening motion." No. 5 reads as follows: "A package of free-flowing clean discrete transparent lumps of ice, substantially uniform in size, the shape of the lumps being regularly and generally characterized by a fractured surface contour that is uneven, the contents of the package being free from snow and the lumps being non-adherent."

Claim No. 7, a process claim, reads as follows: "The method of making a free-flowing mass of ice comprising crushing a block of ice thereby producing a mixture of pieces of ice of various sizes including snow, subjecting the mixture to a vibrating screening motion of high frequency and low amplitude to separate the mixture into one portion that contains the snow and into another portion that consists of free-flowing discrete lumps free from snow, and carrying out the screening operation at a temperature where there will be no substantial melting of the ice." Claim No. 6, which is the only other process claim in suit, is identical with claim No. 7 except that it omits the last sentence in claim No. 7.

We have already described what Orrison claims for his product. It therefore seems unnecessary to analyze phrase by phrase product claims Nos. 1 and 7 which we have above quoted, or any of the other product claims. As to the process claims, it will be seen that they embrace a method consisting of two phases, first crushing a block of ice thereby producing a mixture of pieces of various sizes including snow: (2) subjecting this mixture to a vibrating screening motion whereby the lumps of ice are left free and clear of snow, and come out of the operation free-flowing and non-adherent to each other. The whole process is carried out at a temperature sufficiently low so as to avoid any substantial melting of the ice in the course of the process. However, none of the claims in suit nor the specifications specify any particular temperature for the operation, nor is either the frequency or amplitude of the vibrating screening motion defined within any limits, the specifications stating that "the possible range in the periodicity and amplitude of vibration is a matter of adjustment in securing a product having the desired charateristics." Likewise, neither the claims nor the specifications prescribe any particular number of screens although the drawings illustrate four with interstices decreasing in size from the highest to the lowest, that is, the interstices in the last screen through which the ultimate product, namely, the free-flowing pieces or lumps

of ice fall, ready to be packed in bags, being the smallest.

First as to the defense of fraud, it is claimed that fraud was used in obtaining the patent in that Orrison's attorney, Boyle, led the Patent Office to believe that there had been marked commercial success in the sale of the Orrison product, and that this probably tipped the scales in favor of invention and the granting of the patent. In an amendment to the parent application the representation was made to the Patent Office that "applicant himself in one season has sold in the City of Washington, without any great effort, $50,000 worth of this ice product", and that "these facts establish that what this applicant did was not an obvious thing to do, and that he made an invention of merit in an old and well established industry."

■ However, it is clear from the testimony that Boyle, not Orrison, made this statement; that it was sheer inadvertence on Boyle's part that led him to do so; that Orrison knew nothing about this statement having been made to the Patent Office, and that when asked if the statement was correct, he readily admitted that it was not. Orrison's explanation is that he discussed a number of things with Boyle concerning both the patent and his work in connection with the ice industry; that in this discussion he told Boyle that he had sold $50,000 worth of refrigerators in the City of Washington, and that Boyle had evidently misunderstood him. Boyle himself admitted that he was very probably confused, and that he had no recollection of being told that the ice product was ever sold. There is no showing that this misstatement in any sense influenced the issuance of the patent, or indeed that the Patent Office even considered it. We are satisfied from the weight of the credible testimony that the controversial statement was made through inadvertence and not with any intent to deceive. The decisions upon which defendant relies, such as Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, are clearly not in point. They embrace factual situations entirely different from the present one.

Turning next to the question of infringement, the case has been greatly simplified by defendant's concession, in the course of the trial, that if plaintiff's patent is valid, then defendant infringes,—a concession which appears to be required by the exhibits and the testimony.

We come, then, to the question of the validity of the patent, which must be considered, as respects the question of anticipation, in the light of (1) prior art patents and (2) prior use and publication.

Taking up first the question of prior art patents, the defendant relies on five patents as follows: French patent to Lafarge and Reuter, No. 686451, granted April 14, 1930 on application of December 11, 1929; British patent to Frank Coleman, No. 407996, issued March 29, 1934 on application of September 29, 1932; and the three following American patents: to Bemis, No. 772860, issued October 18, 1904 on application of September 2, 1903; to Stromborg, No. 1005900, issued October 17, 1911 on application of October 6, 1910, and to Converse, No. 1079543 issued November 25, 1913 on application of May 4, 1911. None of these prior art patents upon which defendant relies are believed, either individually or collectively, to represent, when fully analyzed, an actual anticipation of Orrison. There is a dearth of patents prior to Orrison relating to the screening of ice. In fact, there is only one to which the Court has been referred, namely, the French patent to Lafarge and Reuter. While this French patent does embrace an ice crushing element and a device for assorting the crushed pieces according to their size, the screen involved is stationary, namely, there is no vibrating element, and there is no disclosure that the pieces of ice produced are clear and free-flowing. Therefore, we are not prepared to say it is to be treated as an actual anticipation.

The patent to Coleman involves a screen to which is applied a reciprocating or jigging movement against the action of springs in both a vertical and horizontal direction for the purpose of screening or conveying gravel, stone chippings, coal or other broken up material. There is no suggestion in the patent of its application

to ice, and therefore we are not disposed to say that it is to be treated as an actual anticipation, for the primary reason, apart from anything else, that ice has unique charateristics, among them that of regelating, that is, its pieces, after separation and temporary thawing, becoming fused into a solid mass again.

Turning to the American patents cited in anticipation, the earliest of these is to Bemis. It consists of a separator for ore. It relates to a class of separators in which a plurality of inclined screens of different mesh are mounted in a vertical and bodily movable frame which is retracted against the action of a spring, and then suddenly released and thrown in contact with a bumper. Prior to Bemis' device, in separators of this kind, the cam, spring and bumper were located at about the middle of the screen frame, which was carried by two pairs of links for bodily movement. Bemis claims to have improved this earlier construction by having his screen frame extend upwardly at an incline from its lower pivoted end, with a cam engaging the higher end of the screen frame to depress it against the action of a spring and suddenly release it, so that the high end of the frame, being the end into which the ore is fed and therefore the heavier, will fly up against a bumper with sufficient force to cause the ore particles to be thrown upwardly out of the interstices of the screens, and so clear them at every stroke. This mechanism is clearly distinguishable from the Orrison patent device, and again there is no suggestion in Bemis that it was intended to, or could be applicable to other than coarse material such as ore. Therefore, we find no anticipation of Orrison in Bemis.

Turning next to the patent to Stromborg, that embraces a device with a series of screens operating in a water tank. The screens are given a quick downward and backward movement and a slow upward and forward movement, adjustable to diferent inclinations, thus facilitating the screening and separating of different kinds of material. There is no suggestion in Stromborg that it could be used for the screening of lumps of crushed ice, and we fail to see that it could be made successfully applicable thereto.

As respects Converse, it again relates to the screening and sifting of coal, stone or other coarse substances and consists of a rotary screen entirely different in design and operation from Orrison. There is no suggestion that it is intended to apply or could apply to the screening of crushed ice. Therefore, it seems unnecessary to make any detailed analysis of Converse.

Of these five patents, only two, namely, Bemis and the French patent to Lafarge and Reuter, were before the Patent Office in connection with the Orrison application. Still, our conclusion is that none of these five patents can properly be treated as anticipating Orrison, considered individually or collectively. The closest approach is the French patent but, as already explained, we do not consider it sufficiently parallel in design and operation, or in the lumps of ice which it produces, to amount to anticipation of Orrison. Nor do we believe that what the patents prior to this French patent disclosed in the art, including the patents to Bemis, Stromborg and Converse, mount up to an actual anticipation of Orrison when added to the disclosure of the French patent.

■■ It is true that if the elements and purposes in one art are related to those in another art to such an extent as to make an appeal to the mind of a person having skill or knowledge in the second art, the two arts must be said to be analogous. And in such case the mere application of an old process to a new use is not invention. Mandel Bros. v. Wallace, 335 U.S. 291, 69 S.Ct. 73, 93 L.Ed. 12; Funk Bros. Seed Co. v. Kalo Co., 333 U.S. 127, 68 S.Ct. 440, 92 L.Ed. 588; Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973; A. J. Deer Co. v. U. S. Slicing Machine Co., 7 Cir., 21 F.2d 812. However, a presumption of invention is not always overcome by the fact that one skilled in the art may be able to build up the patented process or produce the patented product by selecting parts taken from the prior art. That wisdom which comes *after the fact* will not be per-

mitted to defeat the claim of him who first fully accomplishes the desired end, be it ever so simple, for in the law of patents it is the last step that wins. See Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527; Carnegie Steel Co. v. Cambria Iron Co., 183 U.S. 403, 22 S.Ct. 698, 46 L.Ed. 968; Webster Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177.

The French patent is for an apparatus for crushing ice and for preserving it in cans and in crushed condition. It is not a product patent. Nothing is to be found in the recitals in this French patent which indicates that the pieces of crushed ice produced and assorted by the described apparatus are like those produced by Orrison; in other words, there is nothing to indicate that the pieces of ice are free from snow, non-adherent to each other and of substantially uniform size. There is no disclosure in any patent prior to Orrison for screening ice on a vibrating screen.

In support of his application in the Patent Office, Orrison stated that, in his original conception of making graded ice, his efforts were unsuccessful on stationary screens, but that when he turned to the vibrating screen, he secured the very surprising result which he did not foresee and which was not indicated by anything in the prior art, namely, that the graded pieces of ice were entirely free from snow and had a sparkling, crystal clear appearance. Apparently the Examiner believed these representations to be correct and upon them allowed the Orrison claims. We say "apparently" because unfortunately the Patent Office, in progressing the Orrison application, followed its traditional practice of failing to disclose in any written form the exact basis for its final action, thus greatly hampering a judicial review of the action of the Patent Office. We again take occasion to express the earnest hope that the Patent Office has discontinued, or will discontinue this practice of shrouding the reasons for its final action in the issuance of patents in such unwarranted obscurity.

In addition to the above patents, defendant relies for anticipation on an article by William E. Herb, business manager of Gifford, Wood Company, of Hudson, New York, which appeared in the publication known as "Ice Industry", in its October 1936 issue, under the title "New Equipment for Sizing Crushed Ice". However, the machine there disclosed is not claimed by Herb to embrace any new disclosure in the art, nor is it claimed that it produces free-flowing, clear ice, but merely a grade of crushed ice that was a commercially good product at the time the article was written and still is for some purposes.

Coming next to the question of prior use, the testimony with respect to it falls into three classes: first, that relating to defendant's own use; second, that relating to the Washington Terminal Company use, and third, that relating to the use in Columbus, Ohio.

The testimony of Charles Hoffberger, secretary of the defendant company, is to the effect that he used in his plant, as early as 1931 to make screened ice, the rotary machine which he still has in his possession. Plaintiff concedes that a rotary screen is the equivalent of a flat vibrating screen in its effect upon the ice. So, if Hoffberger's testimony is to be accepted as true although uncorroborated, since his use goes back to 1931, it would be an anticipation of the Orrison patent. However, we are not disposed so to treat it, because totally uncorroborated.

We turn next to the Washington Terminal Company use, the evidence as to which, briefly summarized, is as follows: It is admitted that there were no drawings for the use by this company in 1935 which is the earliest claimed date. So far as the product claims of the patent are concerned, it makes no difference that the screen was not a vibrating one, because the testimony is to the effect that the finished ice produced in Washington was the same as the Orrison product. However, it is doubtful whether this Washington use is sufficiently confirmed to justify it being treated as an anticipation. Actual use prior to the time when the drawings were made, which was the summer of 1936, is not clearly established and so the proof is not sufficient.

The pamphlets advertising this Washington product were printed in October, 1935. They describe ice for high-ball use. There is, however, conflict in the testimony as to when these pamphlets were publicly distributed. The weight of the credible testimony appears to be to the effect that they were distributed generally in the early part of 1936, if not in the late summer or early autumn of 1935. However, even if it be concluded that there is some doubt as to whether, if this disclosure was sufficiently prior, namely, two years, to Orrison's patent application to defeat it, 35 U.S.C.A. §§ 31 and 69, there still remains the Columbus disclosure, and as to this we are satisfied it was clearly one that anticipates Orrison.

The ice machine that was operated in Columbus was ordered as early as 1935 by the City Ice & Fuel Company of Columbus, from the Jeffrey Manufacturing Company, also in Columbus. Employees from both of these companies testified by deposition. There was no indication that they were not telling the truth. Of course, they were speaking of something that happened a good many years ago. However, the photographs taken in the Columbus plant are believed to be bona fide. There is the deposition testimony of Feight, a draftsman employed by the Jeffrey Company in Columbus who prepared the drawings for the machine, which embraced a rotary screen, in the latter part of 1934 or early in 1935, the original tracings of which are in evidence. We also have the testimony of Holters, general manager of the City Ice & Fuel Company in Columbus, which is uncontradicted, to the effect that this machine was ordered from the Jeffrey Company December 18, 1934; that it was in use from February, 1935, until as late as 1941 in the City Ice & Fuel Company's plant; that from his personal knowledge, the machine during that period had at times actually produced as much as four tons of "sized" ice an hour, namely, it had been demonstrated that the machine had this production capacity, and that during this period of some six years commencing in 1935, he, Holters, sold daily, "sized" ice produced by

this machine. In addition, there is testimony of Mock, master mechanic of the City Ice & Fuel Company, who installed this machine in February, 1935, and who is now the company's refrigeration engineer.

Full consideration has been given to the argument made on behalf of Orrison that proof is lacking that this Columbus machine made the same kind of ice as called for by the Orrison patent; that it was not free-flowing, transparent "sized" ice, but ice cubes which constituted a different product, and that therefore Orrison is not anticipated. However, such a conclusion would go counter to the uncontradicted testimony of the witnesses just referred to, which is that the product which their, the Columbus, machine produced was sized, not cubed ice.

It is true that in Columbus, beginning in 1934, this ice machine may not have been doing as good a job as Orrison did, but it did substantially the same thing in substantially the same way, and made substantially the same product.

When so-called common ice, with a core, is put through a crusher, all of the particles that come out will not be clear. Orrison recommends that the core be first taken out, so that the entire cake of ice before crushing is transparent. However, this is a question of degree,—a distinction without a difference. In other words, it is too much of a refinement to say that in 1934, the machine at Columbus did not produce substantially the same character of lumps of ice that the Orrison patent calls for, albeit they may have been somewhat less clear and free-flowing. It is agreed that the Columbus machine, with its very heavy cog-wheel crushing device, was really designed to use great force in producing cubes. But there is no testimony whatever that the crusher wheels, found in the Columbus device, were really compressors. Perhaps it is true that in 1934, the Columbus manufacturers were endeavoring to turn out cubes, or at least lumps of ice that were somewhat more regular and uniform in size than the Orrison product. However, the different exhibits shown in the courtroom, in the course of the trial, of ice just purchased in

the Baltimore market, proved that if cubes are made out of good, clear ice by the Columbus method, they are substantially as free-flowing as the product of Orrison, or the best grade of sized ice currently on sale in Baltimore.

There is an assertion on plaintiff's part that his invention was reduced to practice some three years prior to his first application date, i. e., January 31, 1938. Orrison testified that he set up a model of the apparatus in the basement of his home in 1935, and that it was operated successfully there. Two other witnesses, Jennings, a co-plaintiff, and Waldron, a printer, stated that they saw this operation. Both Orrison and Jennings testified that this model was installed in the cold room of the Terminal Company in Washington in 1935. However, there is no part of the model presently in existence; there are no drawings to show its general design. Waldron, plaintiff's only impartial witness on this point, was unable to state how this model operated, nor could he describe the ice product. The defendant claims that, in the absence of some substantial proof of the invention in 1935, plaintiff is limited to his application date. To offset plaintiff's testimony, defendant produced two impartial witnesses who emphatically denied that Orrison ever set up his model in the Terminal plant in Washington, namely, Bernd, Chief Engineer of the Terminal Company, and Elliott, its General Sales Manager. Bernd testified that had such a model been installed, his permission, as Chief Engineer, would first have been required. He denied that such permission was sought, or that he ever saw the model, despite daily visits to the cold room. Elliott, likewise, visited the cold room daily, but denied any such device was ever installed.

In the absence of more competent testimony, the Court is unwilling to conclude that plaintiff has established 1935 as the date of reduction to practice, and must therefore hold that the plaintiff is limited to his application date of January 31, 1938.

In view of our conclusion that the Orrison patent is invalid because anticipated by prior use, it becomes unnecessary to consider the question of alleged laches on plaintiff's part, i. e., delay in bringing the present suit, raised by defendant.

A decree will be signed in accordance with this opinion, dismissing the complaint, the plaintiffs to pay the costs.