**NELMOR CORPORATION, Plaintiff,**

v.

**JERVIS CORPORATION, Defendant.**
**Civ. A. No. 22655.**

United States District Court
E. D. Michigan, S. D.

April 27, 1964.

Supplemental Opinion May 12, 1964.

Max R. Kraus, Chicago, Ill., Richard Barnard, Birmingham, Mich., for plaintiff.

William J. Morriss, Miller, Morriss & Pappas, Lansing, Mich., for defendant.

LEVIN, Chief Judge.

Plaintiff, Nelmor Corporation, an Illinois corporation having its principal place of business in Michigan, seeks declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202, against Jervis Corporation, a Michigan corporation, holding that defendant's patent No. 2,931,245 (assigned to defendant by Edwin B. Jacobson and hereinafter referred to as the Jacobson patent) is invalid and, additionally, that plaintiff has not infringed this patent.

Plaintiff, a manufacturer and vendor of remote control rear view mirrors for automotive vehicles, alleges interference with its trade because the defendant threatened plaintiff's customers with suit for infringement of the Jacobson patent.

The defendant's answer requests a declaration that the patent is valid, a holding of infringement of Claims 2 and 20 of the Jacobson patent and of defendant's trademark, No. 601,519, and that plaintiff engaged in acts of unfair competition. Jurisdiction of this last claim exists under 28 U.S.C. § 1338.

The court had the benefit of expert testimony from persons familiar with the art, models of devices manufactured and sold by the parties, models made under the prior art, comprehensive briefs before and after trial, and oral argument of counsel.

It is the opinion of this court: I. that the patent here in suit invalid for want of novelty and inventiveness;[1] II. that even if the patent were valid there has been no infringement; and III. that plaintiff has neither infringed defendant's trademark nor engaged in acts of unfair competition.

The products of both plaintiff and defendant are commonly seen in automobiles, wherein a handle is located on the dashboard or inside of the door and a mirror is located on the left front fender or on the outside of the left front door. In the patented device, as well as that marketed by plaintiff, a handle is attached to a control member which rests in a socket, and the mirror is held against a single pivot, shaped as a ball, which allows universal movement. Three cables connect the control member to the mirror in such a manner that when the handle is manipulated corresponding movement is imparted to the rear view mirror.

---

1. If a recitation is required at this late date of the elements requisite to the validity of a patent, see Harvey v. Levine, 322 F.2d 481 (6th Cir. 1963), and cases there cited.

The patent claims of Jacobson assertedly infringed (see drawings) are as follows:

"2. A mechanism for remotely controlling the pivotal movement of a member through a plurality of positions about a first pivot point, comprising: support means pivotally supporting said member for movement about said first pivot point; at least three cables having one group of adjacent ends secured to said member at points thereon substantially spaced from each other and from said first pivot point; control means spaced from said member and secured to the other adjacent ends of said cables for effecting selective movement of said cables with respect to said support means; and resilient means positioned for applying a force coincident with said first pivot point and parallel with one group of adjacent ends of said cables for holding said cables under substantially equal tension between said member and said control means in all of said positions."

"20. Mechanism for remotely controlling a controlled member, particularly an automotive rear-view mirror, for universal movement from a median position comprising; a base, means supported on and by said base for holding said member for said universal movement about a pivot point; at least three cables affixed to said member at points spaced from said pivot point and from each other and holding said member against said base; a control member arranged for universal movement about a second pivot point and connected for moving said cables longitudinally with respect to each other and resilient means applicable to one of said controlled member and said control member and operable substantially at that pivot point associated with said one of said controlled member and said control member for urging same away from the other thereof along an axis substantially parallel to the axis of said cables and thereby holding said cables under substantially equal tension in all positions of

said controlled and control members."

The alleged novel feature of the patented device is the tightening of the cables or wires by the use of coil springs so as to keep each in a state of equal tension. These springs are referred to in the patent as "resilient means." The maintenance of equal tension upon all cables, defendant asserts, is novel because it renders the device completely "stable." A stable device lacks any tendency in itself to move from the position in which it is placed.

As will be seen from an analysis of the prior art, *infra*, the defendant's patent lacks both novelty and invention. Its sole claim to creativity lies in the amalgamation of previously utilized and developed elements which I find accomplish no new purpose. "The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that heretofore performed or produced by them, is not patentable invention." Lincoln Engineering Co. of Ill. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008 (1938), cited in Great Atlantic and Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 151–152, 71 S.Ct. 127, 95 L.Ed. 162, (1950).

Defendant has produced over two million mirrors under the Jacobson patent. Thus, there is no doubt that utility and public acceptance are present in the patented device. "Commercial success is a factor to be considered in a doubtful case. Temco Electric Motor Co. v. Apco Manufacturing Co., 275 U.S. 319, 324, 48 S.Ct. 170, 72 L.Ed. 298. But it is not decisive, and commercial success without invention will not make patentability. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra, * *." Harvey v. Levine, 322 F.2d 481, 486 (1963).

## I.

The use of devices remotely controlled by wires or cables long antedated the pat-

ent in suit. In 1908 France issued a patent to one Chantraine, No. 387,930, which illustrates a cable-operated remotely controlled device. Several wires connect two spheres such that movement of one produces corresponding movement in the other. Chantraine states that the cables are stretched between the control and controlled members. This stretching, or tension, of the connecting cables holds the two members in their respective sockets and is maintained, either in a straight line or angularly through the use of a fixed pulley, by the cables attached to the members so that they are taut.

The Chantraine invention, as well as all others which have followed it, must, to operate, contain the following: (1) a control member, i. e., that which is manipulated by an operator; (2) a controlled member, i. e., the object to be moved; and (3) cables or wires extended between the control and controlled member which serve to impart motion in the former identically to the latter. These cables, or wires, must be maintained in a state of tension, for if they were slack movement of the control member would not be imparted to the controlled member. Parenthetically, it should be noted that although such a remote controlled device could function where cable tension is not needed to hold the members in their respective seats or pivots, in most every device studied the tensioning of the cables serves this added purpose.

The Chantraine patent is apparently the first formal description of the concept of a remote control device operated by cables which is designed for "'universal movement." Although this mechanism utilized no "resilient means" to maintain tension, the necessity for tension was noted in the patent. The only other difference between the Chantraine device and that of Jacobson is in the method of suspension of the controlled member. In the Chantraine device, it rested in a socket and was held there by the tension of the cables, while the controlled member in Jacobson rests on a pivotal ball. Chantraine was not cited in the Jacobson patent.

In 1937 Hoffman obtained German patent No. 650,368, for a remote control device in the nature of a spotlight or lamp for use on automobiles. The ball and socket structure of Chantraine was utilized. Hoffman uses three cables to transmit universal movement rather than the unspecified plurality in Chantraine. Since the ball members in Hoffman are of equal size, the tension of each cable apparently is equal to that of the other two, although such tension is maintained by fixed tautness rather than resilient means. This patent was also not cited in the Jacobson patent.

The British patent of Hunt, No. 433,-112, issued in 1935, utilizes springs as a "resilient means" to attain requisite tension on the cables, and it becomes clear upon comparison of the Hunt mechanism with that of Jacobson that the latter is no more than a simple amalgamation of the former's tensioning means with the Hoffman technique of utilizing three cables to achieve universal movement.

The Hunt patent (see drawings) describes a remote control device for automotive headlamps in which a control member (30) is connected to a controlled member (17) by three cables (19, 26, and 46) which are placed under tension by means of coil springs. The coil springs (23 and 28) are connected to cables (20 and 26) and encircle the ends of said cables adjacent the controlled member so as to apply tension to the cables. Other coil springs (45 and its unnumbered companion) are secured to the control member (30) to balance the coil springs (23 and 28) at the controlled member and to apply friction at the pivotal center of the control member. Hunt refers to these springs as "balancing springs." The third cable (46) is connected to the controlled and control members and is tensioned by a larger spring (56) which applies force or pressure at the pivotal center of the control member (30). The force of spring 56 counterbalances the forces of the other springs (28 and 45, and 23 and its unnumbered counterspring) and provides a system which is stable in every position. The force of

433,112
HᴜɴT

Improvements in or relating to Motor Car Headlamps and the like

Complete Specification Accepted: Aug. 8, 1935.

Fig.4.

Fig.1.

Fig.2.

Fig.3.

Fig.5.

spring 56 also produces sufficient friction between the control member (30) and its engaging socket lip (31) to resist forces of vibration. Such vibration of the vehicle will not affect the adjusted position of the control or controlled members, and the controlled member will not deviate from a set position unless the control member is manipulated.

Every element of Claim 2 of Jacobson is found in Hunt: (A) a controlled member pivotally supported for universal movement; (B) three cables connecting the controlled member and control means; (C) control means supported for universal movement; (D) resilient means for tensioning the cables, the resilient means being coil springs around the cables and at the controlled member.

The Patent Office cited Hunt in the Jacobson patent. Although defendant acknowledged to the Patent Office that tensioning by use of resilient means was not novel, it sought to distinguish Hunt by claiming that the Hunt device was inherently unstable except in its neutral or centered position and therefore vibration of a moving automobile would cause such device to return to center. This distinction proved erroneous on trial. Plaintiff introduced a physical embodiment of the Hunt patent which was operated and demonstrated to be a stable device. Moreover, defendant's expert, upon cross-examination, admitted that spring 56 at the pivotal center of the controlled member can be adjusted so as to render the device stable in all positions. It is obvious that the testimony of the defendant to the Patent Office concerning Hunt was erroneous.

Defendant asserts that despite the now admitted stability of Hunt, it still is distinguishable from Jacobson on essentially two bases. Although Hunt utilizes three wires, only two are on the perimeter of the controlled member so that it may be moved in only one plane, Jacobson uses three and can be therefore manipulated in a multiplicity of planes. Secondly, defendant contends, as it did in the Patent Office, that in Jacobson the spring is positioned at the center of the

pivot in contrast to the Hunt patent, where the springs were positioned away from the center.

The first point may serve to distinguish Hunt, but it does not distinguish the totality of the prior art, for three cables were utilized for universal movement in the Hoffman patent, supra, as well as numerous other prior art patents considered by the court. The only question, therefore, is whether the utilization of a single spring pressing upon the center of both the control and the controlled members to create tension upon the cables connecting those members in Jacobson is such an improvement over the prior art that it may be called invention.

The relocation of the springs used to achieve tension is at most a simple modification of the prior art. A close scrutiny of Hunt (see drawings, supra) reveals that this principle was anticipated therein by the use of a large central spring (56) which pressed against the center of the controlled member so as to create equal tension upon the cables attached to the perimeter thereof.

The use of a single pivot point for supporting the controlled member also is revealed in the prior art. See Copeland patent, No. 1,499,640, issued in 1924, which describes such pivot point for a remotely controlled automotive headlamp utilizing a three-cable technique.

■ Although the court is not unmindful of the presumption of validity of an issued patent created by 35 U.S.C. § 282, it must be concluded that the patent in suit is invalid for want of inventiveness.

II.

■ Even if this patent were found to possess validity, the defendant's device does not infringe it.

Claim 2 of the Jacobson patent describes:

"* * * resilient means positioned for applying a force *coincident with* said first *pivot point* and parallel with one group of adjacent ends of said cables for holding said cables under substantially equal tension be-

tween said member and said control means in all of said positions." (Emphasis added.)

Claim 20 describes:

" * * * resilient means applicable to one of said controlled member and said control member and *operable* substantially *at that pivot point * * *.*" (Emphasis added.)

Plaintiff's device (see drawings, supra) utilizes springs located at the end of each cable to achieve the tension which the Jacobson patent achieves with the centrally located spring. Thus, plaintiff utilizes the tensioning technique of the Hunt patent. This basic difference exists between the patent and the assertedly infringing product. In a heavily occupied art, the scope of a new patent must be narrowly limited to the structure described in the specifications and depicted in the drawings. Cincinnati Milling Machine Co. v. Turchan, 208 F.2d 222 (6th Cir. 1953), Blanc v. Curtis, 119 F.2d 395, 397 (6th Cir. 1941). Many patents for remote control of automobile accessories have been filed utilizing the basic principle first described in the Chantraine patent, supra: e. g., Jesurun patent, No. 1,270,163, issued in 1918; Gray patent, No. 1,570,888, issued in 1926; Copeland patent, supra; Hunt patent, supra; and Castino patent, No. 1,560,-039, issued in 1925.

### III.

■ Defendant's trademark, "JC," appeared on the inside of the housings for its mirrors. Plaintiff placed its own mirror and the components of its device in ten such housings for the purpose of exhibiting its product to automobile manufacturers. The defendant charges that in making these models and demonstrating its devices, plaintiff was guilty of infringement of trademark and acts of unfair competition. There is no merit to these contentions because it is clear from the evidence that the plaintiff actively promoted its product as being better than and different from that of defendant. Therefore, there was no possibility of confusion as to the source of the products.

West Point Mfg. Co. v. Detroit Stamping Co., 222 F.2d 581, 590 (1955).

■ Plaintiff's petition for attorneys' fees is denied. Although defendant's disclosure to the Patent Office in prosecution of this patent was erroneous, there was no showing of bad faith on its part.

Judgment consistent with the determinations here set out shall be entered.

### SUPPLEMENTAL OPINION

Since the opinion in this case was filed on April 27, 1964, counsel for the defendant, Jervis Corporation, has questioned the scope of the court's finding of invalidity of the patent. As stated in the opinion, the entire patent is held invalid for want of inventiveness, despite the fact that most of the proofs at trial concerned claims 2 and 20.

The complaint properly prays, inter alia, that the entire patent be declared invalid; in paragraph 13 of the complaint plaintiff asked "2. a judgment declaring U. S. Letters Patent No. 2,931,-245 void, invalid and to no effect." Defendant's answer denies the allegations of paragraph 13 and requests that all relief prayed for by plaintiff be denied. Further, defendant counterclaimed and prayed for "2. a judgment finding the U. S. Letters Patent 2,931,245 valid and infringed * * *." The answer specifically alleges that claims 2 and 20 of the patent were infringed by plaintiff's device.

■ It is thus clear from the pleadings that the validity of the entire patent was put in issue. This court could not rule only upon the validity of claims 2 and 20, but under the law was obliged to rule upon all the claims of the patent. Kalo Inoculant Co. v. Funk Bros. Seed Co., 7 Cir., 161 F.2d 981, 991, reversed on other grounds, 333 U.S. 127, 68 S.Ct. 440, 92 L.Ed. 588; Kemart Corp. v. Printing Arts Research Laboratories, Inc., 9 Cir., 201 F.2d 624, 632–633.

In fact the proofs at trial were not restricted to the validity of claims 2 and 20. This was recognized in proposed

findings of fact and conclusions of law which defendant submitted after trial:

### "PROPOSED ANNOTATED CONCLUSIONS OF LAW

"(1) The U. S. Letters Patent 2,931,245 is a valid patent.

"(2) The U. S. Letters Patent 2,931,245 contains valid claims 2 and 20."

In the first draft, entitled "TENTATIVE FINDINGS OF FACT AND CONCLUSIONS OF LAW" submitted by defendant on June 4, 1963, No. 13 under "TENTATIVE FINDINGS OF FACT" states: "The spirit of the Jervis (Defendant) device which characterizes it as inventive relates to the use of resilient force applicable at the pivot points to tension all of the cables or wires equally in all positions." In the "PROPOSED ANNOTATED FINDINGS OF FACT" submitted with defendant's post-trial brief received by the court on July 1, 1963, No. 13 was modified to state: "The spirit of the Jervis (Defendant) claimed device which characterizes it as inventive relates, in claims 2 and 20, to the use of resilient force applicable at the pivot points and spaced apart therefrom and concentric thereto to tension all of the cables or wires equally in all positions. * * *"

No. 14 of the defendant's Proposed Findings was unchanged from the tentative draft and states: "The 'spirit of the invention' found in U. S. Patent 2,931,245 is also found in the device of Plaintiff."

No. 23 in defendant's Tentative Findings became No. 24 in the later Proposed Findings and states: "The Jervis (Defendant) devices embodying the substance of U. S. Patent 2,931,245 *and* claims 2 and 20 thereof were the first commercially successful * * *." (Emphasis added.)

As noted in the initial opinion, the court at trial examined and studied the device manufactured by the defendant which incorporated the teachings of the entire patent. Since defendant's only assertion of inventiveness related to the elements of claims 2 and 20, the court's finding that these claims showed no invention must perforce dispose of the entire patent.

It is apparent that defendant's counsel, despite his modification of finding No. 13, considered the entire patent in issue before the court and that it had been subject to proof at trial. The transcript is replete with references to the validity of the patent. At pages 400–402, a colloquy between the court and counsel defines the scope of the inquiry to be the entire patent, not merely claims 2 and 20. The court concerned itself with the question of whether the patented device and the disclosures of the patent revealed any improvement over the prior art. This is the fundamental question of inventiveness.

At pages 42 and 79–80 of the transcript, discussion is directed to the technique of surrounding the cables with casings. No casings are mentioned in claims 2 or 20. However, they are noted in claims 1 and 3 of the patent.

At pages 289–290 and 326, the inquiry is concerned with the use of "a sliding pin." No such element is noted in claims 2 or 20. However, it is described in claim 4.

Further, indications that the inquiry was not limited to claims 2 and 20 may be seen at pages 17, 78, 410–416, 436, and 641.

It is clear that the court not only could have but was indeed obliged to rule upon the validity of the entire patent. The entire patent is invalid.