DYK, Circuit Judge,
concurring-in-part and dissenting-in-part.
I agree with the majority’s construction of claim 32 of U.S. Patent No. 6,368,601 (“the '601 patent”), but as discussed below, I disagree with its construction of claim 9. I write separately primarily to make clear that in construing the claims, we are not deciding that the claims as construed are limited to patentable subject matter. As we noted in Phillips v. AWH Corp., 415 F.3d 1303 (Fed.Cir.2005) (en banc), we do not take validity into account in construing claims, unless “the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous.” Id. at 1327 (quoting Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 911 (Fed.Cir.2004) (quotation marks omitted)). That is not the case here.
At least claim 32 of the 601 patent raises substantial issues of patentable subject matter under 35 U.S.C. § 101. That claim is not limited to the use of a particular isolated DNA molecule in a vaccine or other application. Rather, it broadly encompasses “[a]n isolated DNA molecule comprising a nucleotide sequence encoding an epitope which is specific to PCV-2 and not specific to PCV-1.” '601 patent col.28 11.40-42 (emphasis added). Neither the district court nor the parties provided a precise definition of “isolated” DNA. In order to analyze the DNA or use it for applications (for example, the production of vaccines), DNA must be extracted from *1293 the cell of the living-organism and separated from other cell components, such as RNA, protein, lipids, or in the case of plasmid DNA isolation, from chromosomal DNA. See generally, Peter B. Kaufman et al., Handbook of Molecular and Cellular Methods in Biology and Medicine 1-26 (1995). DNA “isolation” applies generally to the process of extracting DNA from a cell for purposes of genetic analysis. See James D. Watson et al., Molecular Biology of the Gene 740 (6th ed. 2008); see also Kaufman et al., supra, at 1-2. Isolation also encompasses techniques for selective amplification or cloning of such fragments, which allows for a large number of fragments to be available for analysis and sequencing. See Watson et al., supra, at 746. The '601 patent indicates that the isolation of the genomic DNA of the viral strains was performed by a method well known in the art. See '601 patent col.10 1.5-col.11 1.43.
The majority interprets “PCV-2” to mean “a pathogenic pig virus having a circular genome that is at about 96% or more homologous with the four sequences disclosed in the present specification, and about 76% or less homologous with the PK/15 sequence,” Majority Op. at 1288, reversing the district court’s construction limiting PCV-2 to the five viral strains specifically disclosed in the '601 patent. Additionally, the majority construes “specific to PCV-2 and not specific to PCV-1” to read on molecules that contain sequences that encode epitopes[1] common to PCV-1 and PCV-2, as long as the molecule contains at least one sequence that encodes an epitope unique to PCV-2. Id. at 1288-89. Patent claim 32 reads on an isolated DNA molecule that comprises a nucleotide sequence that encodes an epitope unique to PCV-2, which is defined with respect to its homology with the known PCV-1 virus. Thus, under the majority’s claim construction, claim 32 covers DNA sequences that were not in fact isolated by the inventor and are distinct from the five isolated strains disclosed in the '601 patent.
The question is whether the isolated DNA molecule, separate from any applications associated with the isolated nucleotide sequence (for example, the production of a vaccine) is patentable subject matter. Neither the Supreme Court nor this court has directly decided the issue of the patentability of isolated DNA molecules. Although we have upheld the validity of several gene patents, see, e.g., In re Deuel, 51 F.3d 1552 (Fed.Cir.1995); In re Bell, 991 F.2d 781 (Fed.Cir.1993); Amgen, Inc. v. Chugai Pharm. Co., Ltd., 927 F.2d 1200 (Fed.Cir.1991), none of our eases directly addresses the question of whether such patents encompass patentable subject matter under 35 U.S.C. § 101. Although the U.S. Patent and Trademark Office (“PTO”) believes that at least some of these patents satisfy section 101, see Utility Examination Guidelines, 66 Fed.Reg. 1092 (Jan. 5, 2001),[2] thus far the question has evaded judicial review.
*1294 I think that such patents do in fact raise serious questions of patentable subject matter. The Supreme Court’s recent decision in Bilski v. Kappos has reaffirmed that “laws of nature, physical phenomena, and abstract ideas” are not patentable. — U.S.-, 130 S.Ct. 3218, 3225, 177 L.Ed.2d 792 (2010) (quoting Diamond v. Chakrabarty, 447 U.S. 303, 309, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980)); Funk Bros. Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948). Just as the patentability of abstract ideas would preempt others from using ideas that are in the public domain, see Bilski, at 3229-30, so too would allowing the patenting of naturally occurring substances preempt the use by others of substances that should be freely available to the public. Thus, “a new mineral discovered in the earth or a new plant found in the wild is not patentable subject matter. Likewise, Einstein could not patent his celebrated law that E=mc[2]; nor could Newton have patented the law of gravity.” Chakrabarty, 447 U.S. at 309, 100 S.Ct. 2204. These aspects are properly conceptualized as representing a public domain, “free to all men and reserved exclusively to none.” Id. (quoting Funk Bros., 333 U.S. at 130, 68 S.Ct. 440) (quotation mark omitted).
In Funk Brothers, the Court considered the patentability of a mixture of several naturally-occurring species of bacteria. 333 U.S. at 128-31, 68 S.Ct. 440. The patented product was a mixture of bacteria used in agricultural processes, enabling plants to draw nitrogen from the air and convert it for usage. The inventor discovered that certain strains of the bacteria were effective in combination with one another, and contrary to existing assumptions, did not exert mutually inhibitive effects on each other. The Court held that the invention was not patentable subject matter. Id. at 131, 68 S.Ct. 440. The inventor “did not create a state of inhibition or of non-inhibition in the bacteria. Their qualities are the work of nature. Those qualities are of course not patentable.” Id. at 130, 68 S.Ct. 440. The Court furthermore noted:
The qualities of these bacteria, like the heat of the sun, electricity, or the qualities of metals, are part of the storehouse of knowledge of all men. They are manifestations of laws of nature, free to all men and reserved exclusively to none. He who discovers a hitherto unknown phenomenon of nature has no claim to a monopoly of it which the law recognizes. If there is to be invention from such a discovery, it must come from the application of the law of nature to a new and useful end.

Id.

In Chakrabarty, the Court considered whether a human-made microorganism is patentable subject matter under section 101. 447 U.S. at 305, 100 S.Ct. 2204. The microorganism in question was a bacterium that had been genetically engineered to break down crude oil. In concluding that the man-made bacteria was patentable, the Court observed that the claim “is not to a hitherto unknown natural phenomenon, but to a nonnaturally occurring manufacture or composition of matter.” Id. at 309, 100 S.Ct. 2204. The Court went on to distinguish Funk Brothers on the ground that the Chakrabarty bacterium possessed “markedly different characteristics from any found in nature.... His discovery is not nature’s handiwork, but his own; accordingly it is patentable subject matter under § 101.” Id. at 310, 100 S.Ct. 2204 (emphasis added).
Thus, it appears that in order for a product of nature to satisfy section 101, it must be qualitatively different from the product occurring in nature, with “markedly different characteristics from any found *1295 in nature.” It is far from clear that an “isolated” DNA sequence is qualitatively different from the product occurring in nature such that it would pass the test laid out in Funk Brothers and Chakrabarty. The mere fact that such a DNA molecule does not occur in isolated form in nature does not, by itself, answer the question. It would be difficult to argue, for instance, that one could patent the leaves of a plant merely because the leaves do not occur in nature in their isolated form.
Finally, I disagree with the majority with respect to its construction of “ORFs 1-13” in claim 9.[3] Merial argues, and the majority appears to accept, the proposition that one of ordinary skill in the art would read the phrase “ORFs 1-13” to read on any translatable length of DNA between a start and stop codon in the PCV-2 sequence that could encode for a protein greater than twenty amino acids in size. In contrast, the district court concluded that the plain language of the claims indicated that ORFs 1-13 were limited to the ORFs in the disclosed isolates.[4]
I agree with the district court that the phrase must be limited to the specific DNA sequences defined as ORFs 1-13 in the '601 patent based on the intrinsic evidence. The majority holds that the district court’s construction is improperly narrow in scope because “limiting the construction of the term to the exact ORF sequences of SEQ ID 4 would even exclude from the claimed ORFs two of the four sequenced strains of PCV-2.” Majority Op. at 1288. I disagree. The specification appears to specifically define “ORFs 1-13” to include the ORFs from all four of the sequenced strains, not just Imp. 1010,[5] represented by SEQ ID 4. The specification provides:
It was possible to detect 13 open reading frames (or ORFs) of a size greater than 20 amino acids on this sequence (circular genome). These 13 ORFs are the following:
'601 patent eol.13 11.33-34 (emphasis added). The specification then proceeds to detail the ORF sizes and stop and start codons for the Imp. 1010 isolate in table form, and describes the stop and start codons for the other three isolates by reference to Imp. 1010:
The positions of the start and end of each ORF refer to the sequence presented in FIG. No. 4 (SEQ ID No. 4), of the genome of strain 1010. The limits of ORFs 1 to 13 are identical for strain 999. They are also identical for strains *1296 1011-48121 and 1011-48285, except for the ORFs 3 and 13:
ORF3 1432-1549, sense, 108 nt, 35aa ORF1, 3 314-1377, antisense, 705 nt, 234 aa.
Id. eol.13 11.53-61. Thus, “ORFs 1-13” is properly read to include the relevant ORFs on all of the disclosed isolates, because a description of those ORFs follows the assertion that “[t]hese 13 ORFs are the following.” Id. col.13 11.33-34. Because the patentee acted as his “own lexicographer and clearly set forth a definition of the disputed claim term,” Edward Lifesciences LLC v. Cook Inc., 582 F.3d 1322, 1329 (Fed.Cir.2009), the definition in the specification controls, see Phillips, 415 F.3d at 1321. In my view, claim 9 is not literally infringed, and I would also hold that it is not infringed under the doctrine of equivalents.

. An epitope is an immunodominant region of a protein, meaning it is the part of an antigen that is recognized by antibodies of the immune system.

. In response to comments urging the PTO not to issue patents for genes on the ground that genes are products of nature, the PTO remarked:
An isolated and purified DNA molecule that has the same sequence as a naturally occurring gene is eligible for a patent because (1) an excised gene is eligible for a patent as a composition of matter or as an article of manufacture because that DNA molecule does not occur in that isolated form in nature, or (2) synthetic DNA preparations are eligible for patents because their purified state is different from the naturally occurring compound.
66 Fed.Reg. at 1093.

. An Open Reading Frame ("ORF”) is a region or length of DNA that contains a sequence of nucleotides that contains the instructions for making proteins. All ORFs begin and end with a set of three nucleotides known respectively as a start and stop codon.

. It is unclear whether the district court's claim construction limited "ORFs 1-13” to the relevant ORFs in Imp. 1010, or whether the phrase also encompasses ORFs 1-13 of the other isolates disclosed in the patent, namely, Imp. 1011-48121, Imp. 1011-48284, and Imp. 999. The court’s infringement determination is also unclear. See Intervet, Inc. v. Merial Ltd., 643 F.Supp.2d 97, 103 (D.D.C.2009) ("Example 13, however, also states that the positions of the start and end of each ORF refer to the sequence presented in figure 4. Figure 4 contains the precise DNA sequence of one of the five listed strains and thus Example 13, while it does not include the specific DNA sequence of each ORF, refers to a figure from which those specific DNA sequences can be determined. Given this, the Court declines to read the language ‘specific DNA sequence' out of its claim construction, and therefore concludes that Intervet's vaccine does not contain one of ORFs 1-13.”).

.The "Imp.” designation, an abbreviation for "imported,” is a tracking number assigned by the inventors to their pig tissue samples and to any virus they isolated from that tissue.