38 C.C.P.A.(Patents)

## In re ARNOLD.
### Patent Appeals No. 5721.

United States Court of Customs and Patent Appeals.

Dec. 5, 1950.

·Curtis, Morris & Safford, New York City (Truman S. Safford, New York City, and J. Harold Kilcoyne, Washington, D. C., of counsel), for appellant.

E. L. Reynolds, Washington, D. C. (H. S. Miller, Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Judges.

JOHNSON, Judge.

The appellant filed an application in the United States Patent Office for letters patent covering a method of treating certain

materials by means of an alternating electrostatic field so as to fuse and bond the surface of the materials through the selective agitation of molecules at the surface, as distinguished from previously known methods of accomplishing by induction or dielectric heating similar results. The application was examined in the Patent Office as required by law, and the claims presented in the application were rejected as being unpatentable over certain patents cited as references. Preliminary to taking an appeal from the examiner's rejection to the Board of Appeals of the Patent Office, the applicant presented several amendments for the purpose of placing his claims in better form for appeal. Newly presented claims 39, 40, 44, and 45 were held to be allowable, and the appeal to the Board of Appeals was from the final rejection of claims 34 to 38, 41, 42, 43, 46, and 47. The Board of Appeals affirmed the rejection of the claims on the ground that they are unpatentable over the following United States patents: Pitman, 2,087,480, July 20, 1937; Kassner, 2,089,966, Aug. 17, 1937; Keller, 2,179,261, Nov. 7, 1939. The patent applicant twice petitioned for reconsideration by the board of its decision. Unavailing, he brings the case before us on appeal. R.S. 4911, 35 U.S.C.A. § 59a; 28 U.S.C.A. § 1542.

Appellant has consistently contended both within the Patent Office and here that the examiner and later the Board of Appeals failed to understand his invention and consequently misapplied the disclosures of the reference patents to his claims. The applicant appeared *pro se* at the oral argument here to explain the technical substance of his method, as he stated, because of the misunderstanding which he believes has occasioned the rejection in the Patent Office of the claims at bar.

Appellant's method relates to subjecting material to a high frequency alternating electrostatic field, and particularly to applying the energy of the field to selective portions or locations in the material to accomplish a variety of useful results, including welding or bonding and fusion. The use of high frequency alternating electrostatic fields to heat bodies as in welding or bonding operations is not new with appellant, but by his method of selective application of the energy of the field, he contends that he can induce in the material being treated "phenomena similar to those which occur at higher temperatures while the actual temperature of the material remains below that at which they ordinarily occur." It appears that when a polar substance is subjected to an alternating field, the field exerts a moment of force upon individual molecules comprising the body. If the molecules are thought of as having positive and negative charges separated in space along the molecule, it will be seen that the electrostatic field will tend to attract the positive charge toward one electrode and the negative charge toward the other electrode. As the polarity of the alternating field is reversed, the pull on the molecules is also reversed. As the frequency of the alternating field is increased, the molecules have less time after each reversal of polarity to align themselves to the reversed polarity of the field, with the result that the motion of the molecules will begin to decrease as the frequency is further increased. As that phenomenon occurs, an accelerating change in the dielectric constant of the material takes place. The range within the frequency of the alternating electrostatic field at which those phenomena occur is the anomalous dispersion range of the material. At the center frequency of that range, the average of the motions of the molecules induced by the alternating field is at a maximum. In this range maximum energy absorption is said to occur.

Appellant's discovery is not the principle of the anomalous dispersion range. He determines by known methods the anomalous dispersion range "for the particular material and for the particular conditions of treatment." As the field corresponding to the center of that range is first applied, appellant states, "the temperature of the substance is not abruptly increased as might be expected," and "since the relaxation time may be different for each molecule and for given molecules in each environment," he has found "that by the use of this mechanism" he can "selectively induce one sub-

stance within a body or material to behave as though it were at a higher temperature than the rest of the body." Thus, appellant states, he "may cause the surface of a body to fuse without fusing the interior."

The drawings of the application illustrate an apparatus for practicing appellant's method as it relates to bonding or welding together two sheets of thermoplastic material. "When a homogeneous material is used in this way," the specification states, "it is found that the molecules at the surface respond more readily to the alternating field, and therefore will have their range of anomalous dispersion at a somewhat higher frequency than the molecules in the interior of the body. Advantageously, therefore, the higher frequency is selected to give a maximum effect at the surface." The specification then states that "This effect may be further increased by the use of a surface coating to which the frequency is attuned." That coating may be a plasticizer with an anomalous dispersion range different from that of the bodies being bonded. There the frequency is one in the anomalous dispersion range of the plasticizer or it may be a complex frequency including one in the anomalous dispersion range of the plastic material as well as one in the range of the plasticizer.

Where a plasticizer is used, thermoplastic sheets are overlapped and passed between the pressure roller electrodes of an apparatus described in the application. The material is exposed to the selected high frequency field, and as the material passes between the rollers, "there is an instantaneous fusing of the surface" which under the pressure of the rollers produces a bond, the material coming out from between the electrode rollers "without overheating and apparently at a temperature below the normal softening point of the thermoplastic."

The specification states that the same procedure may be followed without the use of the plasticizer coating, but that "the process is more sensitive to exact frequency control since the frequency to which the surface molecules respond is closer to that at which the interior molecules respond so that uncontrolled variations in the circuit may result in a softening of the entire sheet with a consequent squeezing out of material from between the rolls."

Claim 34 is illustrative of the subject matter on appeal, and reads as follows: "34. The method of welding adjoining bodies at least one of which embodies in its substance molecular units responsive to alternating electrostatic fields, those of said units at the surface of said body and in the area to be welded having an anomalous dispersion range the center frequency of which is different from the center frequency of the corresponding anomalous dispersion range of similar units within the interior of said body, which comprises exposing said body, while the surfaces of said bodies are substantially in contact, to an alternating electrostatic field of frequency at a center frequency of the range of anomalous dispersion for said units at the surface of said body under the conditions of treatment, said welding being completed while the temperatures of said bodies remain below their normal softening temperatures."

The patent to Pitman relates to a method for cementing shoe parts, such as a leather sole and upper, by activating a cement applied to the surfaces to be bonded with heat generated "within and/or adjacent" the cement film by high frequency alternating electrical current. Speaking of the frequency of current required, Pitman states that it may vary within wide limits, mentions a specific frequency, and concludes: "It has been found that with each cement an optimum change from electrical energy to heat energy is obtainable * *. * * * the optimum frequency will readily be found by testing a few different values in the above range; * * *." With this statement there should be compared applicant's disclosure of a general procedure for locating the anomalous dispersion range for the particular material to be tested: "Wherever a substantial difference appears between the dielectric constant for the material at one frequency and the dielectric constant at the next frequency chosen * · * * at least a part of a range of anomalous dispersion lies between the frequencies used in these two tests. By making additional tests more closely spaced

within this area * * *" there will be accurately located, appellant states, the desired central frequency of the anomalous dispersion range.

The Kassner patent relates to a process for altering the energy content of dipolar substances by subjecting them to rapidly oscillating electromagnetic fields. Kassner states that his process depends on characteristic periods and frequencies of dipolar substances such as (1) the relaxation time of the orientation of the dipoles when exposed to a varying electric field; and (2) the period of natural oscillation relative to each other of the charges constituting a dipole. He teaches that since dipolar molecules are carriers of electric charges they oscillate in the presence of an alternating electrical field and absorb energy from the field. The excitation is especially strong and energy absorption especially great under conditions of resonance. Plotting frequency and energy absorption graphically, he points out that the depicted region of sudden change is the anomalous dispersion region. Kassner teaches that "dipolar substances * * * behave in a thoroughly new and unforseen manner when they are subjected to the action of an electromagnetic radiation field which oscillates mainly or wholly in at least one of the frequencies which is the same as one of the natural frequencies of the said substances * *. The term 'natural frequency' is intended to mean the range of frequency of the anomalous dispersion and resonance dispersions." He adds, "From the previously described connection between resonance frequency and anomalous dispersion position it results that the latter is a suitable indicator for the resonance frequency."

With Kassner's teaching of the relation of the anomalous dispersion range or region to conditions of resonance there may be compared the statement in applicant's specification that "When the treatment is proceeding the circuit should be tuned to resonance at the particular frequency selected within the anomalous dispersion range and changes in the dielectric between the electrodes or in the spacing of the electrodes will, of course, affect the desired condition of resonance. * * * By

means of a tuning motor controlled by a photo-electric relay the circuit may thus be kept in constant resonance and tuned to give the highest efficiency of treatment." Appellant in his specification elsewhere states, "Although I have described above and find it advantageous to use a circuit tuned to resonance at the particular frequency selected, it is also possible to operate with de-tuned circuits * * *."

Keller's patent relates to a method of heating nonconducting molding materials quickly and uniformly throughout their mass by means of a high frequency field where the material and electrodes comprise a tuning condenser for a power oscillator supplying current. Changes in the capacity of the circuit due to variations of the dielectric constant of the molding material as heating progresses are said to produce corresponding changes in the frequency of the oscillator, keeping thereby the dielectric loss in the material at a maximum throughout the heating operation. The dielectric constant is described as increasing in magnitude as the temperature of the material rises, but the load circuit is kept resonant to the oscillator frequency by a tuning condenser. In this connection, appellant in his specification states: "A further result of using the high frequencies most suitable to purposes of my invention, is the sensitivity of the circuit to various changes in dielectric between the electrodes." He then states that the circuit should be kept resonant as quoted in the preceding paragraph.

Claim 34 was considered by the Board of Appeals to recite in substance the step of applying an electrostatic field the frequency of which yields the greatest degree of energy absorption at the surface of the material being treated. Operating in accordance with Pitman's process was held by the board to satisfy that step. To appellant's contention that Pitman's process heats the *layer* of cement between the leather elements being united whereas his method agitates the molecules at the *surface* of the materials being treated, the board held that in view of the provision in appellant's specification for the use on the surface of the material of a plasticizer coating with an anomalous dispersion range

different from that of the material, there was no distinction between Pitman's surface layer and appellant's. In view of the teaching of Kassner's patent of the unique behavior of dipolar substances in absorbing energy at the natural frequency or anomalous dispersion range, and Pitman's teaching of the use of a frequency yielding an optimum change from electrical energy to heat energy, the board held there was no invention in the process of claim 34 in requiring the application of a frequency such that the energy is absorbed at the surfaces. In reply to appellant's first petition for rehearing, the board stated that a discovery by appellant that surface molecular units possess an anomalous dispersion range different from similar molecular units within the body concerned did not warrant allowance of claims substantially providing for the procedural steps involved in Pitman's process.

Appellant's position on appeal, as stated in his brief, is that his method is concerned with the selective activation of the molecules at the *surface* of "the body which is to be welded," whereas Pitman is concerned with the activation or heating of the entire *layer* of cement which would be coated on one of two bodies to be joined together. Pitman's process, he contends, does not produce selective activation of the molecules at the surface either of "the body which is to be welded" or the cement layer applied to that body. Appellant states that if his principles were applied to Pitman's arrangement, only the molecules at the *surface* of the cement coating would be energized, and not the entire layer of cement as is Pitman's case. That difference is stated by appellant to be the basis of his appeal. The Board of Appeals and the examiner in his view "failed to recognize, or completely ignored" the distinction he urges between a surface and a layer.

Appellant in urging the difference between "surface" and "layer" appears to have in mind that the basis of the rejection of claim 34 by the examiner and the board was "anticipation." Thus it is stated in his brief that "the Pitman patent contains no disclosure anticipating this claim or any other claim here on appeal." Again, at the conclusion of his brief, appellant states that "the processes set forth in these claims are not anticipated by any of the reference patents and that the Board of Appeals erred in rejecting these claims." The rejection by the examiner as well as the decision of the board, however, was that the claims at bar lack invention and thus are unpatentable over the references, not that they lack novelty and are thus anticipated by the references.

The issue in this case is not so much whether the references contain an explicit disclosure that bonding may be accomplished by the application of an alternating electric field at a frequency within the anomalous dispersion range of the molecules at the surface of the bodies to be bonded, as it is with a consideration of whether it amounts to invention for appellant to do that in the face of Pitman's teaching respecting an optimum frequency for changing electrical energy into heat energy in a layer of cement applied to the surface, Kassner's teaching of the relationship of anomalous dispersion range to the frequency of an alternating electrostatic field in producing maximum energy absorption in a dipolar substance, and Keller's teaching of the maintenance of a resonant circuit when molding materials are subjected to an alternating electrostatic field and the interrelationship of the frequency, dielectric constant, and temperature in such a circuit. In discussing the prior art references in the forepart of this opinion we have shown that the teaching of each patent appears to be integrated in some measure into appellant's specification. Basically the principles and techniques set forth by the appellant in his specification are those disclosed in the references as indicated, with the exception that in none of the references is it suggested that the anomalous dispersion range of a dipolar substance may be one thing for molecules in the interior of the substance and another thing for the molecules comprising a so-called surface layer. This latter, if it is a fact, is concededly appellant's discovery, at least so far as the record before us is concerned.

Does the discovery of that fact and its utilization in the selection of the particular frequency of the alternating electrostatic field to be used in the bonding operation entitle the appellant to a patent on the claims here at bar? It is admittedly old in the art to pass a high frequency current between electrodes applied to opposite sides of a layer or layers of material to be bonded. The art of record here shows further that it is old to select a frequency from within the anomalous dispersion range of the material most effectively to utilize the energy of the high frequency field. The improvement appellant adds flows from his discovery that the surface molecules of the material have an anomalous dispersion range of their own distinct from that of the molecules in the inner portion of the material. Having discovered that phenomenon of nature, appellant merely uses the well known procedure for bonding by means of a high frequency field, selecting the particular frequency his discovery informs him is peculiar to the surface molecules of the material involved under the conditions of treatment. Appellant has not invented any new art or improvement embodying or utilizing his discovery of a scientific or natural principle; rather he has used a well known procedure for bonding by means of a high frequency field and merely selected the particular frequency to be used in that procedure which the scientific principle he has discovered indicates to be appropriate. That is not invention. Davison Chemical Corp. v. Joliet Chemicals Inc., 7 Cir., 179 F.2d 793, certiorari denied, 71 S.Ct. 45; Funk Brothers Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 68 S.Ct. 440, 92 L.Ed. 588; Allen v. Coe, 77 U.S.App.D.C. 324, 135 F.2d 11; In re Walker, 99 F.2d 976, 26 C.C.P.A., Patents, 739; In re Mason, 87 F.2d 370, 24 C.C.P.A., Patents, 842. Claim 34 and closely related claims 35, 36, 37, and 38 are accordingly unpatentable.

Claim 41 differs from the preceding claims and calls for a method of selectively fusing one material in the presence of other materials by selecting an alternating electrostatic field frequency near the center of the anomalous dispersion range of the material which is to be fused, and adjusting the conditions of treatment to compensate for the shift in the anomalous dispersion range produced during the progress of the treatment. The "adjusting the conditions of treatment" portion of the claim is adequately taught by Keller. Kassner provides a sufficient disclosure of the balance of the claim. In view of the rejection of all of the claims at bar as unpatentable over Pitman in view of either Kassner or Keller, claim 41 must stand rejected. Claim 42, similar to claim 41, is clearly unpatentable over the references. In each of those claims, a frequency within the anomalous dispersion range of the material itself as distinguished from a range peculiar to molecules at the surface of that material, is applied, and such a method as claims 41 and 42 state is taught by the references. Claim 43 adds to claims 41 and 42 the adjustment feature of claim 41 which as we have seen is met by Keller.

Claim 46 calls for applying energy selectively to a polymeric hydrocarbon by means of a high voltage field increasing thereby the polarization of the hydrocarbon so as to shift the anomalous dispersion range, and applying an alternating frequency within the shifted anomalous dispersion range. We agree with the examiner's analysis that Pitman's alternative use of vinyl compositions (hydrocarbons), Kassner's statement of the theory of polarization, and Keller's discussion of the use of relatively high voltage, preclude the patentability of claim 46. Claim 47 is dependent upon claim 46, specifying that the hydrocarbon is subjected during treatment to "a pressure of between 10 and $10^2$ watts per square inch." That meaningless addition to claim 46 fails to confer patentability upon the claim.

For the reasons stated, the decision of the Board of Appeals rejecting all of the claims at bar is affirmed.

Affirmed.