## MUEHLEISEN et al. v. PIERCE.

No. 13688.

United States District Court
S. D. California, C. D.

Aug. 5, 1953.

Robert M. McManigal, Los Angeles, Cal., Burns, Doane & Benedict, Washington, D. C., for plaintiffs and counter-defendants.

Jamieson & Gabriel, Los Angeles, Cal., for defendant and counter-claimant.

HARRISON, District Judge.

This is a declaratory judgment action, wherein the plaintiffs are seeking to invalidate U. S. Patent No. 2,501,962 issued to defendant Harold Ladd Pierce on March 28, 1950 under an application filed May 16, 1947. The defendant has filed a counterclaim alleging infringement. Inasmuch as I feel that the plaintiffs should prevail, the counterclaim naturally falls by the wayside.

As there are no jurisdictional questions involved, I can pass directly to the patent in suit. The patent "relates to methods and apparatus for expanding rock or earthy materials having a heat expansive component therein and has particular reference to improvements in the expansion of rock material having water of crystallization."

The patent recites:

"It is well known that various igneous materials will expand when subjected to carefully controlled heat. For example, certain types of mica may be expanded into a cellular mass and these mica type minerals are generally referred to as vermiculites. The expansible igneous rocks that have the most commercial value at present, however, are the volcanic glass type of rocks of which perlite is the most commonly used form. These volcanic glasses obtain their crystalline form due to the presence of water of crystallization and when these rocks are carefully heated this water of crystallization may be converted to useful vapor that will expand the rock when the rock is in a plastic state due to heat. This perlitic rock is sometimes referred to as perlitic pitchstone and I have found that the types of perlite that have the the major portion of their silica content combined as sodium aluminum silicate are the most satisfactory."

Grounds of invalidity of the patent as set forth by the plaintiffs are as follows:

"(1) The patent is invalid for failure to describe and claim the alleged invention in such full, clear, concise

and exact terms as are required by the statute;

"(2) the patent is invalid for want of invention over prior art, and for the reason that the subject matter described in the patent is clearly obvious to, and nothing more than the expected skill of, a worker in the art to which the patent relates;

"(3) the patent is invalid by virtue of a Statutory Bar, Public Use more than one year prior to the filing date of the patent; and

"(4) Pierce did not himself originate the subject matter of the patent, but it grew out of the work of another."

The patent in suit is restricted to a process for expanding perlite. To understand the patent its subject matter, perlite, should be defined. The Encyclopedia Americana, Vol. 23, pages 606–607, states as follows:

"The strictly extrusive forms of granitic composition are known as rhyolites (from the Greek word which means to flow), so called because of the flow-structure which is commonly developed in them. The rhyolites are rarely holocrystalline, containing nearly always more or less glass and occasionally consisting wholly of it. These entirely glassy forms of rhyolite are called obsidian. Perlite and pitchstone are varieties of obsidian. Occasionally the rhyolites are frothy in character, due to the rapid escape of steam resulting from the relief from great pressure. This form is known as pumice. Rhyolite is also called *liparte* because extruded abundantly from the volcanoes of the Lipari Islands."

A more detailed description of perlite may be found in plaintiffs' Exhibit No. 22, "A Descriptive Petrography of the Igneous Rocks," by Albert Johannsen, University of Chicago Press, 1952, Vol. II, p. 281.

The evidence clearly indicates that perlite is a species of obsidian and that obsidian is a generic term.

Defendant's expert witness testified as follows:

"The Witness: I myself believe in that paper referred to perlite as a vari-ety of obsidian, using the term 'obsidian' as any all-inclusive name for any volcanic glass.

"The Court: Wouldn't obsidian also cover pumice?

"The Witness: It would."

The defendant insists that he is the patentee of a preheating process for the expansion of perlite. If preheating is old in analogous arts preheating of perlite has been fully anticipated and is not an invention. Paramount Publix Corp. v. American Tri-Ergon Corp., 1935, 294 U.S. 464, 55 S. Ct. 449, 79 L.Ed. 997. See also Pennsylvania Railroad v. Locomotive Truck Co., 1884, 110 U.S. 490, 494, 4 S.Ct. 220, 28 L. Ed. 222.

The close analogy to perlite of other members of the obsidian family is best brought out by C. R. King, defendant's expert witness, in Plaintiffs' Exhibit No. 21, "Pumice and Perlite as Industrial Materials in California," by C. R. King, California Journal of Mines and Geology, Vol. 44, No. 3, pages 311–312 (July 1948). In that article King notes the wide range in chemical composition of perlite, and gives analyses of perlite rocks of minimum and maximum viscosity for practical expansion. Quoting King:

"*Variation in Raw Material.* Perlite is a rock, not a mineral, and therefore is variable in chemical composition within a wide range. Composition of separate deposits differ, and there is variation, even within the same deposit (see table 2). These variations in chemical composition strongly affect the softening point or viscosity at a given temperature, the type and degree of expansion, the size of the bubbles, the wall thickness between bubbles, and the porosity of the resulting product, as well as other physical properties of the expanded material. To date, very little fundamental research has been concluded upon these and other important variables affecting the control of the processing of perlite. The most that can be said at this time is that, in general, a perlite rock containing more than 74 per cent silica,

more than 12 per cent alumina, less than 5 per cent combined alkalis (sodium and potassium oxides), and less than 2 per cent total water, will usually require over 2000° fahrenheit expansion temperature and a relatively long time (on the order of many seconds rather than fractions of a second) in the hot zone, and will tend to yield a relatively heavy but structurally strong and minutely vesicular product. Likewise, a perlite in the range of 70 per cent silica, less than 14 per cent alumina, more than 8 per cent combined alkalis, with appreciable calcium, iron, and manganese oxides (3 or 4 per cent combined), and with more than 3 per cent total water, will usually expand in a temperature range between 1300° and 1700° fahrenheit. It will also tend to yield a relatively lightweight coarsely vesicular and friable product, and will require a relatively short time contact at maximum temperature (a fraction of a second to a second or two).

"The foregoing rough variation in silica, alumina, alkali, and water content represent the practical range in analyses of expanding obsidians. Higher silica plus alumina and lower alkali content obsidians are too viscous at practical furnace temperature to expand properly. More basic glasses (silica content much lower than 70 per cent, and higher alkali, lime, magnesia, and iron content than the above range) are too fluid near the softening point to retain the bubbles of expanding gas, and result in a product too coarsely vesicular."

Thus King recognizes the practical range of chemical composition of perlites to be also the practical range of composition for expanding obsidians in general. Typical samples of pumice, pitchstone, and obsidian all fall within this range for practical expansion, as figures in the following table show:

### Chemical Composition of Expansionable Obsidians

| | Silica | Alumina | Combined Alkalis | Total Water (or ignition loss) | Calcium, Iron, and Manganese Oxides |
|---|---|---|---|---|---|
| Low Viscosity Obsidians [1] | Over 74 | Over 12 | Under 5 | Under 2 | |
| High Viscosity Obsidians [2] | Approx. 70 | Under 14 | Over 8 | Over 3 | 3 to 4 (combined) |
| Typical Perlite [3] | 71.88 | 12.73 | 7.28 | 3.84 | |
| Typical Obsidian [4] | 73.84 | 13.00 | 7.74 | 0.53 | |
| Typical Pumice [5] | 70.38 | 15.82 | 7.80 | 3.62 | |
| Typical Pitchstone [6] | 70.19 | 12.37 | 6.60 | 6.48 | 3.71 |

Since obsidian, pitchstone, and pumice do fall within the range of chemical composition for practical expansion, as defined by King, it has been shown to my satisfaction that these igneous rock materials are closely analogous to perlite, and defendant is

1. C. R. King, "Pumice and Perlite as Industrial Materials in California," California Journal of Mines and Geology, Vol. 44, No. 3, pp. 311–312, (July 1948).

2. Ibid.

3. King, p. 294.

4. Ibid.

5. Ibid.

6. Albert Johannsen, "A Descriptive Petrography of the Igneous Rocks," University of Chicago Press, 1952, Vol. II, p. 281.

presumed to have had knowledge of the literature pertaining to these materials.

I find further that the expansion of silica hydrogel and of vermiculite is sufficiently apposite the work of defendant to charge him with knowledge of the developments in these fields. The end products of expansion of silica hydrogel and vermiculite have the same industrial uses as expanded perlite and the expansion processes all operate on the same principle, heating the material to a viscous state so that the escaping water vapor puffs it up, much like pop corn.

The main accomplishment of the defendant was minimization of "explosion" of expanding perlite particles to undesirable fractured pieces and dust. This difficulty was due to too quick expansion of escaping water vapor before the perlite had attained sufficient viscosity to expand rather than fracture. Also a greater degree of expansion was achieved than had been attained by one-step heating presumably because preheating perlite causes it to attain a more uniform temperature at the expansion stage, and because reduced water content allows quicker heating without fracturing.

He accomplished this improved expansion of perlite by preheating the raw material "sufficient to remove a portion of the combined water from said perlite, but insufficient to cause any apparent expansion thereof". This is the crux of the alleged invention.

Heinrich Romberg, in German Patent No. 613945, published May 28, 1935, disclosed the preheating of obsidian and pitchstone.

Andrew L. Gladney, in U. S. Patent No. 2,021,956, November 26, 1935, disclosed the preheating of pumicite, which is fragmented pumice.

Otto A. Labus, in U. S. Patent No. 1,-992,669, February 26, 1935, taught that preheating of vermiculite improved its expansion by enabling the material to reach a more uniform temperature throughout at the expansion step.

While the extent of preheat is only a matter of degree, even this has been anticipated in the prior art. John D. Morgan, in U. S. Patent No. 2,161,186, June 6, 1939, reduced the combined water content of silica hydrogel by preheating it before the expansion step.

E. S. Shepherd, in an article entitled, "Gases in Rocks and Some Related Problems", American Journal of Science, 5th Series, Vol. 35-A, (1938), pp. 325-351, plaintiffs' Exhibit No. 8, suggested the whole program of defendant's experiments in his teaching that expansion of obsidians is a function of their water content. The Shepherd experiments clearly point the way to control of perlite expansion by control of its water content.

One skilled in the art could follow the road signs of the prior art and by routine experiment determine the conditions of temperature, pressure, and time most suited to particular perlite samples. And this is just what the defendant did. The evidence discloses that while the defendant was in the employ of the Rheem Research Products Corporation the actual determination of the best preheat conditions was worked out by a technician by the name of Walter H. Kaelin and appropriated by the defendant. Any discovery set forth in claims 5, 6, 7, and 8 was the work of Mr. Kaelin. The fact that operating ranges were determined by Mr. Kaelin in routine experiment shows that anyone skilled in the art could work out this phase of the purported invention.

This is further demonstrated by the defendant himself in the patent in suit, where he stated at column 3 of the patent:

"Although two different types of perlitic rock may appear to have the same chemical composition and internal structure, they nevertheless should be subjected to test runs to determine the exact duration of time with specific temperatures for the process runs. This is not a severe operational drawback, however, inasmuch as it is customary to obtain the rock material from a single locality and under these circumstances the rock is likely to be uniform in type or texture."

As noted before, the evidence discloses that perlites vary widely in their composition. What does the patent teach other than that experiments must be performed

to determine the operating conditions for the perlite at hand? When optimum results are attained optimum conditions are determined, a general rule for all scientific research.

■ Defendant claims by experiment to have found the optimum conditions for expansion of perlite. He purports to have discovered that preheat such as to remove a portion of the combined water without apparent expansion of the perlite gives the best expansion. Even assuming that removal of a portion of the combined water as defendant has done is new, this is merely a change of degree. "A patentee may not arbitrarily select a point in a progressive change and maintain a patent monopoly for all operations in that progressive change falling on one particular side of that arbitrarily selected point. It is only where the selected point corresponds with the physical phenomenon and the patentee has discovered the point at which that physical phenomenon occurs that the maintenance of a patent monopoly is admissible. A claim must be based on invention. The claim to invention depends here upon an alleged discovery of certain limits or points which do not exist in fact and there is therefore no invention." Kwik Set, Inc., v. Welch Grape Juice Co., 2 Cir., 1936, 86 F.2d 945, 947, cited with approval in Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 1945, 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973.

■ Defendant is not entitled to a monopoly of the optimum conditions for the expansion of perlite by virtue of his alleged discovery of a law of nature that perlite reduced in combined water content expands to a greater degree with a lower loss due to "explosion". "He who discovers a hitherto unknown phenomenon of nature has no claim to a monopoly of it which the law recognizes. If there is to be invention from such a discovery, it must come from the application of the law of nature to a new, and useful end." Funk Brothers Seed Co. v. Kalo Inoculant Co., 1948, 333 U.S. 127, 130, 68 S.Ct. 440, 441, 92 L.Ed. 588; Davison Chemical Corp. v. Joliet Chemicals, 7 Cir., 1950, 179 F.2d 793, certiorari denied 1950, 340 U.S. 816, 71 S.Ct. 45, 95 L.Ed. 599. In re Arnold, 1950, 185 F.2d 686, 691, 38 C.C.P.A., Patents, 768, is especially apposite:

"Appellant has not invented any new art or improvement embodying or utilizing his discovery of a scientific or natural principle; rather he has used a well known procedure for bonding by means of a high frequency field and merely selected the particular frequency to be used in that procedure which the scientific principle he has discovered indicates to be appropriate."

■ While the evidence is very conflicting, I find that the patent in suit is invalid by reason of public use more than one year prior to the filing of the application for patent. I believe the oral testimony as well as the documentary evidence establishes this clearly by a strong preponderance of the evidence. I feel there is no reason why I should discuss the evidence in this regard except to say that I feel the expenditure of several hundreds of thousands of dollars at the Phoenix plant by the Rheem Research Products Corporation was neither a pilot plant nor a plaything.

Plaintiffs are entitled to judgment as prayed for and are directed to submit proposed findings and judgment within twenty days from date hereof.