ARMOUR PHARMACEUTICAL COM-
PANY, a Delaware corporation,
Plaintiff,

v.

RICHARDSON–MERRELL, INC., a Dela-
ware corporation, Defendant.

Civ. A. No. 2421.

United States District Court
D. Delaware.

March 1, 1967.

Aaron Finger and Max S. Bell, Jr., of
Richards, Layton & Finger, Wilmington,
Del., Walter J. Blenko and Eugene F.
Buell, of Blenko, Hoopes, Leonard &
Buell, Pittsburgh, Pa., and Carl C. Batz,
Chicago, Ill., of counsel, for plaintiff.

Edmund D. Lyons, of Morris, James,
Hitchens & Williams, Wilmington, Del.,
Charles J. Merriam, Jerome B. Klose,
Allen H. Gerstein, of Merriam, Marshall,
Shapiro & Klose, Chicago, Ill., and Har-
vey W. Edelblute, New York City, of
counsel, for defendant.

## OPINION

CALEB M. WRIGHT, Chief Judge.

Plaintiff, Armour Pharmaceutical
Company (Armour), brings this declara-
tory judgment seeking to have defendant,
Richardson-Merrell's (RM) patent Num-
ber 3,004,893 ('93) invalidated. RM has
counterclaimed for infringement. Cur-
rently before the Court are cross motions
for summary judgment. Armour moves
for a summary judgment of invalidity,
and RM seeks a "partial summary judg-
ment" of infringement. The uncontested
facts are as follows:

The '93 patent teaches the use of en-
teric coated proteolytic enzymes, notably
trypsin and chymotrypsin, as orally ad-
ministered anti-inflammatory agents.
These enzymes are derived from pan-
creatin which is a substance derived
from the freshly ground pancreas of hogs

and cattle.[1] Prior to the disclosures of the '93 patent, pancreatin had long been used as a digestive aid, designed to supplement the natural secretions of the human pancreas and facilitate digestion of the complicated protein molecule.[2] In this use as a digestive supplement, pancreatin had been enterically coated and orally administered to persons whose own production of proteolytic enzymes was insufficient. An enteric coating is applied to a medicament for the purpose of transporting the medicament unaltered through the acidic environment of the stomach and into the small intestine.[3]

After the digestive use of proteolytic enzymes, Dr. Irving Innerfield was responsible for the next major step in their utilization as therapeutic agents. Trypsin and chymotrypsin had been previously isolated and identified as compounds found in pancreatin, but it was Innerfield who first saw their unique therapeutic value as anti-inflammatory agents. He tried injecting these compounds at the site of the inflammation (parenteral administration) and found them to be efficacious in reducing inflammation.[4] Subsequently, other methods of administration were developed, notably the buccal method, which comprises putting a tablet in the pouch of the cheek, and the rectal method, which utilizes rectal suppositories.[5] Unfortunately, all of these methods, although efficacious, had certain drawbacks. In addition to the customary antipathy on the part of the patient to the parenteral and rectal administrations, the buccal method was of only marginal utility because the proteolytic enzymes operated to partially digest the soft tissue lining the cheek causing the patient pain and discomfort.

Given these disadvantages in the various methods of administering the enzymes, it would appear to the casual observer that oral administration would be a viable alternative. However, several factors mitigated against the possibility of oral therapy. First, the human body naturally secretes, through the pancreas, concentrations of these enzymes far in excess of the normal therapeutic dosage. Hence the logic of oral therapy appeared questionable at the outset, for there seemed to be no advantage in any marginal increase such as that which would result from oral administration.[6] Second, it was questionable whether these enzymes, because of their size, could be absorbed through the walls of the small intestine.[7] Third, these proteolytic enzymes were capable of digesting each other, and therefore the introduction of trypsin or chymotrypsin into an environment in which other proteolytic enzymes were present would appear to be foolhardy.[8]

Despite this formidable catalogue of disadvantages, Dr. Innerfield decided that the enteric coated product might be useful after all, primarily as an anticoagulant. Accordingly, on November 25, 1952 Innerfield filed an application for a patent on the enteric coated product. The Innerfield application, which had been assigned to the National Drug Company (ND)—which later became a division of RM—was abandoned on September 23, 1954 with Innerfield's consent.[9]

Subsequently, Dr. Martin, a biochemist and Director of Research at ND, caused some vivisection work to be done on rats in the ND laboratories. Briefly, the small intestine of the rats was tied off

1. Statement of Facts ¶ 3 found in Brief of Plaintiff in support of Motion for Summary Judgment at pages 3–10 (hereinafter cited Facts ¶———). Transcript (hereinafter Tr.) at 61.

2. Facts ¶ 5; Martin Deposition 59; Tr. 61.

3. Facts ¶ 6; Tr. 61.

4. Facts ¶ 7; Martin Deposition 10; Tr. 62.

5. Facts ¶ 8; Tr. 62–63.

6. Lesh Deposition 153–154; Defendant's Brief in Opposition to Plaintiff's Motion for Summary Judgment (hereinafter DB) at 7–8.

7. DB at 13.

8. Lesh Deposition 110–112.

9. Facts ¶ 8; Tr. 62–63.

and trypsin was injected below the tie. Unexpectedly, the trypsin was absorbed through the walls of the small intestine and proved effective in alleviating an artificially created edema in the rats' feet.[10] Relying upon this work Martin caused a second application on enteric coated trypsin to be filed on February 15, 1956.[11] Since the vivisection work had indicated that the optimal point of absorption was the ileum—the lower third of the small intestine—Martin's application directed that the trypsin be coated to resist disintegration until it reached the ileum. After several changes with respect to the size of the dosage,[12] the '93 patent issued on October 17, 1961. Prior to the filing of the application there had been no clinical evaluation of the proposed product.[13]

The Court is of the opinion that the '93 patent must fall for want of invention. What Martin did was to discover that trypsin was absorbable through the walls of the small intestine. Concededly, it had been thought that the trypsin molecule because of its size could not penetrate the intestinal wall. But nothing Martin did increased the permeability of the intestinal wall or altered the characteristics of trypsin to facilitate its absorption. The discovery that the molecule could penetrate the intestinal wall, although unexpected, was nothing more than the discovery of a natural phenomenon. And, it is a well-settled principle of patent law that patents do not issue for the discovery of natural processes or properties. Davison Chemical Corp. v. Joliet Chemicals, Inc., 179 F.2d 793 (7th Cir. 1950), cert. denied, 340 U.S. 816, 71 S.Ct. 45, 95 L.Ed. 599.

The *Davison* case sets forth in detail the considerations to be mobilized when the patentability of a natural phenomenon is urged. There the patent related to the manufacture of silica gel for use as a desiccant. When silica gel is used as a desiccant various degrees of porosity are required. Silica gel is manufactured by mixing sodium silicate with acid under violent agitation; the resulting product is permitted to set, then it is broken into small pieces, washed with water and dried. The manufacturing process summarized above was covered by another patent. Connolly, the *Davison* patentee, discovered that there was a definite relationship between the temperature of the wash and the porosity of the resultant silica gel. The Seventh Circuit held that such a discovery, although useful, was not patentable since it merely unearthed a hitherto unsuspected natural phenomenon. The Seventh Circuit continued:

"Consequently the question becomes one of whether, when Connolly discovered the scientific fact that temperature of the washing water directly affects the density of the washed product, he then devised a process for utilization of that scientific fact which amounted to invention. What the

---

10. Martin Deposition 35–36.

11. This discovery was important in answering the three disadvantages of orally administered trypsin catalogued above. First, Martin's work clearly showed that trypsin could be absorbed by the small intestine. Second, the fact that the small intestine could absorb trypsin, when coupled with the knowledge that the human pancreas naturally secretes large quantities of the enzyme, indicated that somehow the naturally produced enzymes were not reaching the optimum absorption point—the ileum. The natural enzymes were somehow dissipated before they reached the ileum. Hence it became obvious that the oral therapy would be efficacious provided the trans-

portation of the orally administered enzymes to the ileum, without alteration, could be guaranteed.

12. Dr. Martin started out recommending a dosage of 0.5 to 25 mg. of trypsin, but this was amended to 25 to 75 mg. and subsequently amended to 10 to 50 mg. Tr. 66.

13. In fact, the deposition of William Swain, clinical research associate in the ND division of RM, indicates that there may never have been any extensive clinical evaluation of the oral product. Swain Deposition at 38–40. But for this motion the Court assumes that there was clinical evaluation of the enterically coated product sometime after the filing of the original application. Tr. at 65–66.

skilled scientist, having been informed of the newly discovered scientific fact, would have done, would amount only to the exercise of ordinary skill in his profession." 179 F.2d at 794.

The Court went on to examine Connolly's process, and found it to be unpatentable, since the improvements he made based upon the discovery of the relationship between the temperature of the wash water and the porosity of the final product would have been obvious to an artisan armed with the same knowledge.

"[T]he artisan, knowing that the temperature determines the porosity, could very readily, by empirical methods, determine the particular pore size required for a particular use of the gel and then, by maintaining the wash water at the temperature at which such pore size was attained, procure the uniform product desired." 179 F. 2d at 795.

*Davison* is strikingly analogous to the present case. Here Martin, faced with the task of developing an orally administrable trypsin, and having been told that the intestinal wall would not absorb these large molecules, discovered that a certain portion of the small intestine—the ileum—would in fact absorb these molecules. Certainly that discovery is not patentable. It is a natural phenomena, the natural occurrence of which is in no way attributable to the scientific skill of Martin, who merely unveiled it. Further, having made the discovery, Martin did nothing out of the ordinary to render his discovery commercially operable. Once the discovery that trypsin could penetrate the intestinal wall was made, the rest was obvious. To get an effective anti-inflammatory all that remained to be done was to coat the trypsin so that it would pass through the stomach and upper small intestine to the ileum, unaltered by the acidic environment of the upper digestive tract. That Martin hit upon the device of an enteric coating was not particularly ingenuous since these coatings were well-known in the pharmaceutical field and had been employed successfully for many years. Nor can RM

take refuge in the fact that the enterically coated product proved to be an effective anti-inflammatory. Because of Innerfield's previous work with the parenteral, rectal and buccal forms of trypsin the anti-inflammatory properties of the enzyme were well-known. Once it was found that the enzyme could penetrate the walls of the small intestine and thus enter the blood stream, it was hardly astounding that its anti-inflammatory properties should manifest themselves.

RM contends that in view of Innerfield's conclusion, demonstrated in his withdrawal of his patent application, that the enteric coated product would not work, the activity of Martin in developing the very product discarded by Innerfield must be invention. The argument is that Martin's efforts become more inventive, more unobvious, because he acted in a fashion directly opposed to the advice of a recognized authority in the field. With this argument the Court is unable to agree. Martin made the discovery, related above, that trypsin could be absorbed through the intestinal wall; it is in the light of this discovery that his subsequent efforts must be scrutinized for their inventiveness. Innerfield, at the time he directed the withdrawal of his application was not equipped with this knowledge. Therefore, the fact that Innerfield opposed the development of an oral product should not be viewed as a meaningful deterrent because Martin had the benefit of additional knowledge which clearly indicated that Innerfield was mistaken in his earlier assessment of the oral product.

There is yet another theory which requires the conclusion that the '93 patent is invalid. As set forth above, Dr. Innerfield used enteric coated trypsin and eventually filed an application for a patent on the product on November 25, 1952. The product disclosed in the Innerfield application, which was subsequently withdrawn, was the same as that which Dr. Martin patented in the '93 patent—enteric coated trypsin. Since Innerfield's application was withdrawn, it cannot be cited as prior art against Mar-

tin. 35 U.S.C.A. § 102(g) (1952). However, since Innerfield and Martin had worked together in the preparation of the Innerfield application, the existence of that application, known to Martin, means that Martin was not the original inventor of enteric coated trypsin. 35 U.S.C.A. § 102(f) (1952).

■ RM argues first that the Innerfield application was abandoned and second that the product was therein being urged as an anti-coagulant. The fact of the application's abandonment destroys the application as prior art, and ordinarily an abandoned application will not be considered as rebutting novelty or showing anticipation. However, the question here is something different. Here Innerfield conceived of the enteric coated product and that conception was communicated by Innerfield to Martin. Thus Martin's decision to evaluate the enteric coated product was a mere revival of Innerfield's discarded idea. Granted Innerfield objected violently to the commercialization of the enteric coated product, fearing it might reflect adversely on the parenteral, rectal and buccal versions. Nevertheless, the first to conceive of the idea of enterically coated trypsin was Innerfield, and he communicated his conception to Martin. Thus Martin's subsequent evaluation and valuable discovery are tainted by the fact that the product which he was evaluating was not his own conception.

RM seeks to meet this argument by contending that the Innerfield application related to the use of enteric coated trypsin as an *anti-coagulant* rather than an *anti-inflammatory*.[14] This argument assumes that the use of the product as an anti-inflammatory is a patentable new use.

■ Originally it was thought that a new use for an old product could never be the subject of a patentable invention. The case law gradually evolved to the point that new and non-analogous uses for old products were recognized to be valuable contributions. See 2 Walker, Patents § 124 (Deller ed. 1964). In 1952 § 100(b) was added to the patent code; § 100(b) provides that the term "process"

"includes a new use of a known process, machine, manufacture, composition of matter, or material."

However, § 100(b) does not make every new use patentable. The new use must still meet the requisite standard of invention set forth in 35 U.S.C.A. § 103 (1952). See Shell Development Co. v. Watson, 148 F.Supp. 373 (D.D.C.1957).

In the present case the new use was not invention under § 103. The anti-inflammatory properties of proteolytic enzymes were well-known through the work of Dr. Innerfield. It was known that these enzymes, once introduced into the blood stream—either parenterally, buccally or rectally—would be transported to the site of the inflammation and combat the inflammation. Consequently, since the objective of enterically coating the medicament was to introduce it into the blood stream, it was completely foreseeable to those skilled in the art that

14. This argument is advanced by RM in their oral argument. Tr. at 67–68. However, a perusal of the Innerfield application indicates that Innerfield clearly foresaw the anti-inflammatory properties. The application discloses three cases: Case A, pain and swelling of the leg; Case B, thrombus of the central retinal vein; Case C, thrombo-phlebitis of the left leg. Thrombus refers to a clotting of blood in the vein; thrombophlebitis is a condition where the walls of the vein become swollen causing clotting. Clearly with respect to Case A Innerfield foresaw the anti-inflammatory properties of his preparation. As to Case C, the therapy was directed toward reducing the inflammation of the vein and removing the thrombi. Accordingly, the evidence strongly favors the Armour contention that Innerfield was applying for a patent on an anti-inflammatory not merely an anti-coagulant. But, regardless of the fact that the evidence does not support RM's naked assertion that the Innerfield application was exclusively directed toward an anti-coagulant, the Court will assume, for purposes of this motion, that Innerfield's application was directed solely towards the anti-coagulant use of the enzyme.

the enterically coated product would have anti-inflammatory properties.

RM cites Benger Laboratories Ltd. v. R. K. Laros Company, 317 F.2d 455 (3d Cir. 1963), cert. denied, 375 U.S. 833, 84 S.Ct. 69, 11 L.Ed.2d 64, for the proposition that the application of a coating to a known medicament to make it orally administratable constitutes invention. The citation is inapposite.

■■ *Benger* was concerned with the development of an intramuscularly injectable preparation to cure iron deficiency anemia, an affliction which was especially prevalent in newborn pigs. For years ferric hydroxide had been administered intravenously; however, the intravenous injection was not satisfactory because of the need for professional skill in its administration. This naturally involved attendant veterinary costs. The *Benger* patentees discovered that when ferric hydroxide was complexed with dextran it yielded an intramuscularly injectable product. The Third Circuit held this discovery to be patentable. The present case is distinguishable. Here Martin discovered that trypsin itself was absorbable—he did not complex or mix the trypsin with any product to facilitate its absorption as did the *Benger* patentees. Martin's problem was to get the absorbable trypsin to the appropriate locus for absorption; to accomplish this he availed himself of a carrier well-known in the prior art. The *Benger* patentees on the other hand developed a new complex which was suitable for intramuscular injection. Concededly, the fact that their product could be injected intramuscularly was due to a "natural process". However, they had to first create the product which participated in the natural process. Martin constructed no such new complex. He merely discovered a natural property of a preexisting product—such activity does not reach the level of patentable invention. Nor does invention inhere in the fact that Martin selected an entric coating for the enzyme, since the enteric coating and its function were well-known in the pharmaceutical art.

Since the Court has concluded that the '93 patent is invalid, there is no reason to consider the cross motion presented by RM seeking a judgment of infringement.

Accordingly, the Court holds that the '93 patent is invalid, and directs that summary judgment be entered in favor of the plaintiff, Armour Pharmaceutical Company.

Let an appropriate order in conformity herewith be submitted.