**ARMOUR PHARMACEUTICAL COM-
PANY, a Delaware Corporation**

v.

**RICHARDSON–MERRELL, INC., a Dela-
ware Corporation, Appellant.**

No. 16779.

United States Court of Appeals
Third Circuit.

Argued Dec. 18, 1967.

Decided May 17, 1968.

Charles J. Merriam, Merriam, Mar-
shall, Shapiro & Klose, Chicago, Ill.
(Allen H. Gerstein, Chicago, Ill., on the
brief), for appellant.

Walter J. Blenko, Blenko, Leonard &
Buell, Pittsburgh, Pa. (Max S. Bell, Jr.,
Wilmington, Del., Eugene F. Buell, Pitts-
burgh, Pa., Richards, Layton & Finger,
Wilmington, Del., on the brief), for ap-
pellee.

Before BIGGS, McLAUGHLIN and
VAN DUSEN, Circuit Judges.

OPINION OF THE COURT

BIGGS, Circuit Judge.

The plaintiff-appellee Armour
Pharmaceutical Company (Armour)
brought suit against defendant Richard-
son-Merrell, Inc. (RM) seeking a declara-
tory judgment of invalidity and non-in-
fringement of United States Patent
3,004,893 ('93) issued to Dr. Gustav J.
Martin and assigned to R. M.[1] Upon
cross motions for summary judgment the
District Court, basing its decision on
stipulations, depositions, interrogatories
and a hearing found the patent invalid
for want of invention and entered sum-
mary judgment for Armour.[2] RM ap-
peals from that judgment. Jurisdiction
is based on Sections 1338 and 1291, 28
U.S.C.

The patent in dispute is for "Enteric
Coated Trypsin and Chymotrypsin Anti-
Inflammatory Compositions", issued on

---

1. Armour also sought injunctive relief but
it does not appear that such relief was
granted. See the order of the District
Court, Doc. No. 71.

2. In light of the district court's disposition
of the action, it did not consider RM's
cross motion seeking a summary judg-
ment of infringement.

October 17, 1961.[3] The facts here relevant were well stated by the court below as follows: "The '93 patent teaches the use of enteric coated proteolytic enzymes, notably trypsin and chymotrypsin, as orally administered anti-inflammatory agents. These enzymes are derived from pancreatin which is a substance derived from the freshly ground pancreas of hogs and cattle. Prior to the disclosures of the '93 patent pancreatin had long been used as a digestive aid, designed to supplement the natural secretions of the human pancreas and facilitate digestion of the complicated protein molecule. In this use as a digestive supplement, pancreatin had been enterically coated and orally administered to persons whose own production of proteolytic enzymes was insufficient. An enteric coating is applied to a medicament for the purpose of transporting the medicament unaltered through the acidic environment of the stomach and into the small intestine.

"After the digestive use of proteolytic enzymes, Dr. Irving Innerfield was responsible for the next major step in their utilization as therapeutic agents. Trypsin and Chymotrypsin had been previously isolated and identified as compounds found in pancreatin, but it was Innerfield who first saw their unique therapeutic value as anti-inflammatory agents. He tried injecting these compounds at the site of the inflammation (parenteral administration) and found them to be efficacious in reducing inflammation. Subsequently, other methods of administration were developed, notably the buccal method, which comprises putting a tablet in the pouch of the cheek, and the rectal method, which utilizes rectal suppositories. Unfortunately, all of these methods, although efficacious, had certain drawbacks. In addition to the customary antipathy on the part of the patient to the parenteral and rectal administrations, the buccal method was of only marginal utility because the proteolytic enzymes operated to partially digest the soft tissue lining the cheek causing the patient pain and discomfort.

"Given these disadvantages in the various methods of administering the enzymes, it would appear to the casual observer that oral administration would be a viable alternative. However, several factors * * * [militated] against the possibility of oral therapy. First, the human body naturally secretes, through the pancreas, concentrations of these enzymes far in excess of the normal therapeutic dosage. Hence the logic of oral therapy appeared questionable at the outset, for there seemed to be no advantage in any marginal increase such as that which would result from oral administration. Second, it was questionable whether these enzymes, because of their size, could be absorbed through the walls of the small intestine. Third, these proteolytic enzymes were capable of digesting each other, and therefore the introduction of trypsin or chymotrypsin into an environment in which other proteolytic enzymes were present would appear to be foolhardy.

"Despite this formidable catalogue of disadvantages, Dr. Innerfield decided that the enteric coated product might be useful after all, primarily as an anticoagulant. Accordingly, on November 25, 1952 Innerfield filed an application for a patent on the enteric coated product. The Innerfield application, which had been assigned to the National Drug Company (ND)—which later became a division of RM—was abandoned on September 23, 1954 with Innerfield's consent.

"Subsequently, Dr. Martin, a biochemist and Director of Research at ND,

3. A typical claim is Claim (1) as follows: "An article of manufacture for the introduction of trypsin into the blood stream for systemic treatment of inflammation which comprises an orally administrable dosage unit in which the effective therapeutic ingredient consists of 10 to 50 mgs. of trypsin, said dosage unit being enterically coated the enteric coating being of sufficient thickness so as to resist dissolution and disintegration of the dosage unit in passing through the gastrointestinal tract until it reaches the ileum in which it disintegrates permitting liberation of the trypsin and absorption of the trypsin into the blood stream."

caused some vivisection work to be done on rats in the ND laboratories. Briefly, the small intestine of the rats was tied off and trypsin was injected below the tie. Unexpectedly, the trypsin was absorbed through the walls of the small intestine and proved effective in alleviating an artificially created edema in the rats' feet. Relying upon this work Martin caused a second application on enteric coated trypsin to be filed on February 15, 1956. Since the vivisection work had indicated that the optimal point of absorption was the ileum—the lower third of the small intestine—Martin's application directed that the trypsin be coated to resist disintegration until it reached the ileum. After several changes with respect to the size of the dosage, the '93 patent issued on October 17, 1961. Prior to the filing of the application there had been no clinical evaluation of the proposed product." See 264 F.Supp. 1013.

Stated simply, prior to Dr. Martin's discovery that the ileum would absorb orally administered trypsin,[4] and consequently act as an anti-inflammatory agent, it was known that trypsin would act as an anti-inflammatory agent if administered by injection, by suppository or buccally (by holding the material in the mouth against the cheek wall through which it can be absorbed). It was also known that trypsin was effective as a digestive aid if taken orally. The process of enterically coating a medicament for the purpose of transporting it through the acidic environment of the stomach was well known prior to Martin's patent.

The court below held that Martin merely discovered the natural phenomenon that the ileum would absorb trypsin and subsequently applied that new discovery by a well-known process of enterically coating the trypsin enabling it to be effective if administered orally. The district court relied on the principles stated in Davison Chemical Corp. v. Joliet Chemicals, 179 F.2d 793, 794–795 (7 Cir.), cert. denied, 340 U.S. 816, 71 S.Ct. 45, 95 L.Ed. 599 (1950), as follows: "Consequently the question becomes one of whether, when Connolly discovered the scientific fact that temperature of the washing water directly affects the density of the washed product, he then devised a process for utilization of that scientific fact which amounted to invention. What the skilled scientist, having been informed of the newly discovered scientific fact, would have done, would amount only to the exercise of ordinary skill in his profession. * * * [T]he artisan, knowing that the temperature determines the porosity, could very readily, by empirical methods, determine the particular pore size required for a particular use of the gel and then, by maintaining the wash water at the temperature at which such pore size was attained, procure the uniform product desired."

We will affirm the judgment of the court below.[5]

It has long been a principle of patent law that the discovery of a law of nature cannot form the basis of a patent. Le Roy v. Tatham, 14 How. 155, 156, 174, 14 L.Ed. 367 (1852). The purpose of that rule has been expertly stated as follows: "A patent for a process is a patent for the described combined use of all the laws of nature utilized by that process. A patent for a principle is a patent for only one of the laws of nature *per se* used in a process. If a patent for a principle were granted and sustained, it would be much broader than a patent for a process, because it would cover all processes which aim at

4. We employ the term "trypsin" as a shorthand notation for both trypsin and chymotrypsin.

5. There is no dispute as to any genuine issue of material fact involved in the resolution of the issue of patentability of the discovery of a phenomenon of nature in the suit at bar and thus this court can review the summary judgment entered by the court below. Davison Chem. Corp. v. Joliet Chemicals, 179 F.2d 793 (7 Cir.), cert. denied, 340 U.S. 816, 71 S.Ct. 45, 95 L.Ed. 599 (1950).

the same result and which use the particular law of nature covered by the patent for a principle, no matter in which combination with other laws. A patent for a process, on the other hand, covers only its own method of using all of the laws of nature which it utilizes. To grant and sustain a patent for a principle would induce an inventor to guess which of the laws of nature used in his process would always be found indispensable and, guessing rightly, would enable him, by claiming that particular law, to suppress all subsequent processes using it, and thus to suppress all subsequent inventions in the same field until such time as his patent might expire. A patent for a process, on the contrary, leaves the field open to ingenious men to invent and to employ other processes utilizing part of the laws used by the patented process, or using all of them in other combinations and methods." 1 Deller's Walker on Patents Second Edition, pp. 140–141. See Muehleisen v. Pierce, 114 F.Supp. 503, 507 (S.D.Cal. C.D.1953), aff'd 226 F.2d 200 (9 Cir. 1955).

Applying these principles to the case at bar it would follow that one could not patent the discovery that the ileum will absorb orally administered trypsin. A contrary result would mean that all future uses of that principle, perhaps unrelated to the use of trypsin as an anti-inflammatory agent, would be barred by Martin's patent. As an analogy, consider the impact on future discoveries if one could get a patent on the principle that water will extinguish fire.

On the other hand, Martin has not based his patent on the discovery that the ileum will absorb trypsin. He claims an enterically coated trypsin for use as an anti-inflammatory agent. Thus, it would seem that allowing a patent on the restricted use Martin made of his discovery of a natural phenomenon would not only be consistent with our patent laws, but would further their purpose.[6] The employment of the newly discovered principle of nature would remain open to all those desiring to utilize it. We discern no requirement in the policy of the patent law that the method by which the discovery be utilized also be a new method. However, the Supreme Court and several courts of appeals have held to the contrary. In Funk Bros. Seed Co. v. Kalo Inoculant Co., 333 U.S. 127, 68 S.Ct. 440, 92 L.Ed. 588 (1948), the Supreme Court held invalid a patent for a leguminous plant inoculant.[7] It had been known that certain bacteria would enable leguminous plants to take nitrogen from the air and convert it into nitrogenous compounds. However, prior to the patentee's discovery, no one species of bacteria would infect the roots of all leguminous plants, and thus farmers had to use separate bacteria for use on separate plants. Mixed cultures had proved unsatisfactory because the different species of the bacteria produced an inhibitory effect on each other. The patentee discovered that some strains of species of bacteria do not mutually inhibit each other and, when tested and selected, could enable the farmer to use one mixed culture of bacteria. If the Supreme Court had held the patent invalid, as Mr. Justice Frankfurter suggested in his concurring opinion, on the ground that the patentee had not stated any specific combination of bacteria, the holding would have been consistent with the policy presented earlier in this opinion. As Mr. Justice Frankfurter stated, the patent had to fall because the patent's acceptance under the circumstances

6. For the purposes of this discussion we assume, but do not decide, that Martin was the appropriate person to be granted a patent on the claimed product. Armour contends that Martin merely applied the teaching of Innerfield.

7. An example of the claims at issue follows: "An inoculant for leguminous plants comprising a plurality of selected mutually non-inhibitive strains of different species of bacteria of the genus Rhizobium, said strains being unaffected by each other in respect to their ability to fix nitrogen in the leguminous plant for which they are specific."

"would require, for instance in the field of alloys, that if one discovered a particular mixture of metals, which when alloyed had some particular desirable properties, he could patent not merely this particular mixture but the idea of alloying metals for this purpose, and thus exclude everyone else from contriving some other combination of metals which, when alloyed, had the same desirable properties." 333 U.S. at 134, 68 S.Ct. at 443.

However, the majority of the Supreme Court held the patent invalid on broader grounds: "Bond does not create a state of inhibition or of non-inhibition in the bacteria. Their qualities are the work of nature. Those qualities are of course not patentable. For patents cannot issue for the discovery of the phenomena of nature. See Le Roy v. Tatham 14 How. 155, 156, 174, 14 L.Ed. 367 (1852). * * * He who discovers a hitherto unknown phenomenon of nature has no claim to a monopoly of it which the law recognizes. If there is to be invention from such a discovery, it must come from the application of the law of nature to a new and useful end." 333 U.S. at 130, 68 S.Ct. at 441.

"Discovery of the fact that certain strains of each species of these bacteria can be mixed without harmful effect to the properties of either is a discovery of their qualities of non-inhibition. * * The aggregation of select strains of the several species into one product is an application of that newly-discovered natural principle. But however ingenious the discovery of that natural principle may have been, the application of it is hardly more than an advance in the packaging of the inoculants. Each of the species of root-nodule bacteria contained in the package infects the same group of leguminous plants which it always infected. * * *

"There is, of course, an advantage in the combination. The farmer need not buy six different packages for six different crops. He can buy one package and use it for any or all of his crops of leguminous plants. And, as respondent says, the packages of mixed inoculants also hold advantages for the dealers and manufacturers by reducing inventory problems and the like. But a product must be more than new and useful to be patented; it must also satisfy the requirements of invention or discovery. * * * [O]nce nature's secret of the non-inhibitive quality of certain strains of the species of Rhizobium was discovered, the state of the art made the production of a mixed inoculant a simple step. Even though it may have been the product of skill, it certainly was not the product of invention. There is no way in which we could call it such unless we borrowed invention from the discovery of the natural principle itself. That is to say, there is no invention here unless the discovery that certain strains of the several species of these bacteria are non-inhibitive and may thus be safely mixed is invention. But we cannot so hold without allowing a patent to issue on one of the ancient secrets of nature now disclosed. All that remains, therefore, are advantages of the mixed inoculants themselves. They are not enough." 333 U.S. 131–132, 68 S.Ct. at 442.

Our reading of the Supreme Court's opinion in Funk leads us to conclude that the test of patentability of a natural phenomenon is as follows: Would an artisan, knowing the newly discovered natural phenomenon require more than ordinary skill to discover the process by which to apply that phenomenon as the patentee had done? See National Lead Co. v. Western Lead Co., 324 F.2d 539, 542 (9 Cir. 1963); Davison Chemical Corp. v. Joliet Chemicals, 179 F.2d 793, 794 (7 Cir.), cert. denied, 340 U.S. 816, 71 S.Ct. 45, 95 L.Ed. 599 (1950); In re Arnold, 185 F.2d 686, 38 C.C.P.A. 768 (1950). Once nature's secret that the ileum would absorb trypsin was uncovered, any artisan would have known the process of enterically coating the trypsin to enable it to pass through the acidic environment of the stomach and continue into the ileum.

RM argues that Martin did more than discover that trypsin was absorbable through the intestine. It is asserted that Martin discovered that when a concentrated dosage of trypsin was placed in the ileum, absorbability of such an extent occurred that an anti-inflammatory effect could be achieved by some still mysterious transfer to the point of injury. Thus RM contends that Martin not only discovered the absorbability of trypsin by the ileum but also the anti-inflammatory effect of that absorption. Assuming *arguendo* that Martin did make such a discovery it is of no aid to his argument. Such a discovery would merely increase his discovery of a natural phenomenon and under the Supreme Court's opinion in Funk Bros. Seed Co. v. Kalo Co., supra, Martin's application of that newly discovered principle would itself have to be inventive in order to sustain patent '93.

In view of the basis of our decision it is unnecessary to discuss or decide other issues raised by the parties.

The judgment will be affirmed.